**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frederick Ed SOUDAN,
Defendant-Appellant.**

No. 85–2349.

United States Court of Appeals,
Fifth Circuit.

Dec. 15, 1986.

---

Wm. W. Burge, Houston, Tex., for defendant-appellant.

Henry K. Oncken, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., Robert M. Twiss, Trial Atty., Washington, D.C., for plaintiff-appellee.

Before GARZA, DAVIS and JONES, Circuit Judges.

PER CURIAM:

This case arises from an international shell game involving a number of players and millions of dollars. The proof at trial showed that appellant Soudan and several other individuals, with no oil, no money, and no oil tanker, bought a tanker on credit, loaded it with oil that was not theirs, sold the oil to South Africa, and sunk the tanker in the hope of recovering the insurance proceeds. The appellant grossed $4.25 million from the scheme and then failed to declare the income to the Internal Revenue Service. Soudan also perjured himself before the grand jury. Chief among the various assignments of error advanced by appellant is the claim that Soudan was denied the effective assistance of counsel at trial. Finding no merit to Soudan's claims on appeal, we affirm the convictions entered below.

I

In 1979, appellant went to Europe in search of an oil deal for his company, American Polamax, Inc. He made contact with a Greek ship captain, Nicholas Mitakis, who could supply six 200,000 ton shipments of Saudi Arabian oil at a low price if the oil could be sold to OPEC-boycotted countries. Anton Reidel, a Dutch commodity trader who worked for the Beets Trading Company, was the broker for Mitakis. Soudan began to arrange a deal to find a South African buyer[1] for Mitakis' oil. Soudan was referred to James Shorrock and John Austin, partners in the South African brokerage firm of Haven International. Soudan told Shorrock that Polamax had available oil as a result of his connections with influential Arabs; Shorrock and Austin then made a formal offer to SFF, the South African oil company, for a spot cargo of crude oil.

Soudan reported this offer to Reidel, but in order to disguise the fact that Saudi oil was being delivered to a blacklisted country, Soudan devised a cover-up. The plan was to discharge the bulk of the oil in Durban, South Africa, and then discharge the remainder in Corpus Christi, Texas. Appellant told SFF that he had a close relationship with a refinery that would certify receipt of a full tanker load in Texas, thus disguising the South African sale. Soudan traveled to South Africa and met with SFF officials, who were doubtful about appellant's financial capabilities. Soudan made numerous representations to SFF officials which were not true in order to allay their fears.[2] Soudan also ex-

---

1. South Africa has been blacklisted by the Arab oil producers.

2. On October 15, 1979, Soudan, accompanied by John Austin, met in South Africa with SFF officials Henry Wiggett, S.P. Naude, and Jon Briedenkamp. Evidence at trial established that Soudan told these men that: 1) Polamax controlled the Dallas-Fort Worth Oil Co., an exploration company which owns 255 oil drills and operates 140 oil wells; 2) Polamax controlled the Good Hope Refineries in Louisiana, which he claimed has a processing capacity of 250,000 barrels a day; and 3) he had already purchased 37.5 million barrels of Saudi Arabian oil and was

plained that although he already owned an oil tanker, he wanted SFF to assist him in buying another ship to transport the oil, for which he would furnish the crew. Soudan consummated this transaction with SFF by signing as an agent of "American Polamax International and Seeking Engineering," a company which appellant said was controlled by Polamax, and agreeing to provide 214,000 metric tons of Saudi Arabian light crude at $33 per barrel between February 5th and 10th, 1980. Naude, signing for SFF, agreed to provide a letter of credit to the Swiss Credit Bank of Zug, Switzerland, in favor of American Polamax International and Seeking Engineering. The letter authorized payment to Polamax immediately upon completion of discharge at Durban and receipt of certain documents to prove the sale.

Soudan now needed the ship. With the help of a London ship broker, appellant located a tanker called the SOUTH SUN. Without inspecting the ship, appellant agreed to the offeror's initial asking price of $12.3 million. Then, telling Shorrock that his own vessel had blown a turbine, appellant sought to parlay his SFF oil contract into a loan for the purchase of the SOUTH SUN. Soudan once again went to South Africa. Shorrock introduced appellant to officials of the international division of Merca Bank. At the Merca Bank, appellant told Mr. Manie DuPlessis that Polamax was a well-financed U.S. corporation and repeated the financial misrepresentations made earlier to SFF. DuPlessis asked why a substantial company like Polamax needed help in financing for a $12,000,000 vessel. Soudan explained that because independent carriers do not permit their ships to sail to South Africa, he needed a vessel financed by a third party in order to conceal Polamax's sale of oil to South Africa.

DuPlessis agreed to provide a letter of credit financing appellant's ship purchase.[3] In response, appellant assured DuPlessis that he had already paid for the oil, so that the SFF payment would indeed be available for repayment of the Merca Bank's loan. DuPlessis telexed to SFF to verify the existence of Soudan's contract of sale and Soudan executed a formal letter on behalf of Polamax stating agreement to DuPlessis' conditions. Satisfied with appellant's *bona fides,* DuPlessis arranged for a letter of credit in the amount of $12.3 million to be issued upon presentation of the documents necessary for the sale of the SOUTH SUN. Thus, by November 23, 1979, appellant was able to obtain 100% financing for a tanker, saying he would give as collateral the oil which he had convinced SFF and the Merca Bank was his to sell. Having arranged for the sale of the oil and the procurement of the vessel, the schemers drew up an agreement between Polamax and Beets Trading, Reidel's commodity brokerage, formalizing their plan. In return, Beets promised to finalize the oil sale between Beets and SFF and pay Polamax approximately $4.5 million of SFF's payment to Beets.

Now the shell game moved from financial misrepresentation to the actual oil itself. On November 29, 1979, the Italian oil company Pontoil chartered the SOUTH SUN, now renamed the SALEM, to transport 200,000 tons of oil from Kuwait. Pontoil had contracted to sell this Kuwaiti oil to Shell International. Pontoil's chartering of the SALEM presented the conspirators with a problem: they had promised Saudi oil to South Africa. Soudan told Naude that there were loading problems in Saudi Arabia and that the oil was being purchased in Kuwait. Appellant then met with Reidel, Naude and others on December 19, 1979, to prove ownership of the oil cargo and demonstrate the oil was already

offering the excess for sale in six 200,000 ton shipments. None of these statements were true.

3. DuPlessis agreed to provide a letter of credit financing Polamax's ship purchase upon the following conditions: (1) that the Merca Bank receive a guarantee from SFF that as soon as the oil was delivered, SFF's bank would pay the purchase price of the vessel directly to Merca Bank; (2) that Polamax give the Merca Bank a lien on the vessel; (3) that Polamax give the Merca Bank a lien on the vessel's insurance; and (4) that Polamax cede to the Merca Bank a lien on the oil cargo.

enroute to South Africa. Reidel produced the masters copy of the bill of lading with the name of the consignee Pontoil and the port of discharge, Italy, obliterated. Soudan had seen the bill of lading before this information showing the oil's ownership and destination was concealed. The SFF officials, demanding even more substantial proof of ownership than the altered bill of lading, insisted that they be given a statement of title and an indemnity letter which Soudan then furnished.

The SALEM left Kuwait on December 10th and arrived in Durban, South Africa, on December 27, 1979. While enroute, the Italian company Pontoil sold the SALEM's cargo to the Shell International Trading Company, a subsidiary of Royal Dutch Shell. Shell agreed to pay $56 million for the oil due upon Shell's receipt of the bill of lading and the other ownership documents from Pontoil. On December 28, 1979, the oil tanker moored at Durban and began discharging its cargo. A $12 million payment was made by SFF to the Merca Bank, and 90% of the balance on the oil sale, approximately $32 million, was paid to Beets Trading.

On January 17, 1980, when the SALEM should have already been at Gibralter, the captain and crew of the British merchant ship TRIDENT spotted the SALEM without any name painted on its bow slowly sinking off the coast of Senegal. Despite the protestations from the crew that the vessel had suffered numerous explosions and fire damage, the captain of the TRIDENT saw no such evidence. Further investigation revealed that the SALEM was deliberately sunk by opening its valves and allowing sea water to flood the engine room. The obvious inference raised by the evidence was that the ship was deliberately sunk without any oil, in order to cover up the fact that the Kuwaiti oil had already been sold to South Africa.

On January 23, 1980, two days before Shell International learned that its oil was not at the bottom of the sea, but rather in South Africa, Shell paid Pontoil the contract price of $56 million. As the result of subsequent law suits between Shell, SFF, and Lloyds (Shell's and Pontoil's insurer), Shell's ultimate loss was $15 million; SFF's loss was $30 million; and Lloyds' loss was $10 million. Merca Bank did not suffer a financial loss because it was paid upon discharge of the oil. If the SALEM had failed to arrive in Durban, however, Merca Bank would have lost $12 million because appellant had failed to give Merca Bank a lien on the vessel's insurance. The appellant made approximately $4.25 million from this complicated series of transactions.

Once in possession of the proceeds from the scheme, Soudan attempted to launder his ill-gained funds. Among the transactions was a purported distribution of $650,000 from Soudan to James Shorrock. Soudan told Shorrock that it was necessary to provide invoices to support this alleged payment, so Shorrock provided Soudan with blank Haven International stationery which appellant used to prepare invoices and receipts for Shorrock's signature.[4] To prepare his 1980 federal income tax returns, Soudan hired an accountant and told him that Polamax had no income from the SALEM transaction. The $4.25 million from the SALEM transaction ostensibly belonged to a "financing group" which had financed the SALEM, and Polamax was allegedly only a conduit to receive and spend funds on behalf of this group. Based on this information the accountant prepared a 1980 income tax return showing that Polamax's total income was only $21, and that appellant's personal income was only $1,950.

Soudan gave the false documents from Shorrock to the accountant to present to the IRS, claiming that they documented expenses on behalf of the financing group.

---

**4.** One of the receipts, dated October 25, 1980, stated that Shorrock had received $650,000 from Soudan. According to immigration records, however, Shorrock left the United States on October 16th, several days prior to the date reflected on the receipt. In addition, two of the other receipts, dated January 10, 1980 and February 16, 1980, were on letterhead stationery which had not been printed until March of 1980. Shorrock in fact never received the $650,000 represented by the October 25, 1980 receipt.

In addition, appellant gave the accountant several other documents which purported to document payments and expenses. In April 1984, appellant voluntarily gave a sworn deposition which was provided to the grand jury in which he stated that he, acting through co-defendant Ghazou, paid Shorrock $650,000 in cash in October of 1980 in New York City. Soudan also said that he never told SFF employees that he possessed contracts with Saudi Arabia or anyone else for the sale of oil, or that he owned a refinery in the United States.

Following the indictment in this case, Shorrock was arrested in Holland pursuant to a United States extradition request. Shorrock told IRS Special Agent Robert Duelm, who came to transport him back to the United States, that he had never received the $650,000 from appellant. At the time of this confession, Shorrock had received no assurances of leniency from the United States government.

## II

On May 24, 1984, appellant and codefendants Abdul Wahab Al Ghazou and James Hillary Shorrock were charged in a twenty-three count indictment filed in the United States District Court for the Southern District of Texas. The indictment charged appellant with thirteen counts of wire fraud, in violation of 18 U.S.C. § 1343 (counts 1–13); one count of interstate and foreign transportation of money taken by fraud, in violation of 18 U.S.C. § 2314 (count 14); one count of using false documents in a matter within the jurisdiction of the United States, in violation of 18 U.S.C. § 1001 (count 16); two counts of making a false statement on an income tax return, in violation of 26 U.S.C. § 7206(1) (counts 17 and 18); and three counts of making a false statement to a grand jury, in violation of 18 U.S.C. § 1623 (counts 20–22). The indictment further charged appellant, Ghazou and Shorrock with conspiracy to obstruct the lawful governmen-

tal functions of the Internal Revenue Service, in violation of 18 U.S.C. § 371 (count 15); and with conspiracy to obstruct justice and to make false statements to a grand jury, in violation of 18 U.S.C. § 371 (count 19). Finally, the indictment charged defendant Shorrock with one count of making a false statement to a grand jury (count 23).

Following a nine week trial before District Judge Carl O. Bue, Jr., appellant was convicted on March 26, 1985, on counts 6–22 and acquitted on counts 1–5. Ghazou was convicted on all counts with which he was charged. Shorrock pled guilty before trial and testified as a government witness. On May 3, 1985, appellant was sentenced to a term of imprisonment totalling 35 years. Ghazou was sentenced to a term of imprisonment of five years.[5]

Judge Bue described this case as "one of the longest, one of the most complex, and one of the most protracted in terms of evidence, arguments, and presentations in which I have participated...." In Soudan's assignment of errors for appeal,[6] his chief complaint is that trial counsel had a conflict of interest in continuing his representation of appellant, thereby denying Soudan the effective assistance of counsel. Our review of each of appellant's claims reveals that his arguments are without merit.

## III

It is unquestioned that the defendant's right to effective assistance of counsel in a criminal case includes the right to representation free from the actual conflict of interest on the part of defense counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2042, 80 L.Ed.2d 674 (1984); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *United States v. Carr*, 740 F.2d 339 (5th Cir.1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1865, 85 L.Ed.2d 159 (1985). Mere

5. Abdul Wahab Al Ghazou is not a party to this appeal.

6. The sufficiency of the evidence against Soudan is not raised on appeal. The outline of the

complex oil fraud scheme was necessary, however, to understand Soudan's claims on appeal in context.

speculation about a conflict, however, is insufficient to establish ineffective representation. *United States v. Alvarez,* 580 F.2d 1251, 1255 (5th Cir.1978). It is necessary to establish an actual conflict of interest. *Cuyler v. Sullivan, supra; Parker v. Parratt,* 662 F.2d 479 (8th Cir.1981), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 91 (1982). "In order to establish a violation of the Sixth Amendment, a defendant who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718. To prevail on this claim, Soudan must show an actual conflict of interest which prejudiced his defense at trial.

Soudan's argument is primarily based on an alleged attorney/client relationship between Bruce Locke, Soudan's trial counsel, and James Shorrock, a co-conspirator in the oil fraud scheme who became a government witness. Mr. Shorrock testified before the grand jury that he had received a $650,000 payment from Mr. Soudan. After this grand jury testimony, Shorrock contacted Soudan to inform appellant that Shorrock had in fact perjured himself before the grand jury by claiming to have accepted the $650,000 payment. This statement by Shorrock left him vulnerable to a charge of perjury in the United States and potential civil tax liability in Shorrock's native South Africa. In order to maintain Shorrock's perjured statement before the grand jury, Soudan set up a meeting between Shorrock, Soudan, and Bruce Locke, who was acting as counsel to Soudan. Locke questioned Shorrock about his testimony, but the fact that Shorrock had lied to the grand jury was known only to Soudan and Shorrock—at no time was Locke privy to the information that the documented $650,000 payment was a fraud. Mr. Shorrock repeated this false statement to the grand jury the following day, and then reported to Mr. Locke that he had been questioned about the $650,000 again and had ratified his previous statement.

Appellant argues that Locke and Shorrock established an attorney/client relationship. Thus, Locke had a divided loyalty between Soudan and Shorrock, so Soudan was denied the effective assistance of counsel. Furthermore, since Mr. Locke "represented" Shorrock by discussing Shorrock's grand jury testimony with him, Soudan also claims he was denied his right to have his attorney effectively cross-examine an adverse witness. Finally, Locke's involvement in the preparation of Soudan's income tax returns is claimed as a conflict of interest impairing Locke's ability to defend Soudan at trial. Each claim is without support in the law or the facts of this case.

A

The initial fallacy of appellant's assignment of error is that Mr. Locke never represented Mr. Shorrock. There was no representation, and there was no attorney/client relationship. Consequently, there was no privileged communication between Locke and Shorrock and no impediment to cross-examination. This record reflects no ineffective assistance of counsel.

The record clearly reflects that when Mr. Shorrock met with Mr. Locke on February 15, 1984, Locke was acting solely in his capacity as the attorney for appellant. Shorrock had just testified before the grand jury and was concerned that he had been asked questions about the $650,000 which he had ostensibly received from appellant, but which appellant had in reality kept for himself. At this time, Shorrock's interests were clearly adverse to appellant's. It was clearly not in Shorrock's best interest for him to testify that he had received the $650,000 which appellant had in fact retained. It is equally clear from the transcript that Mr. Shorrock recognized this fact. On the other hand, it was crucial to appellant's interest that Mr. Shorrock testified that he (Shorrock) had indeed received the $650,000. Soudan had not reported the receipt of the $650,000 on his tax returns, had not paid the federal income tax which would be due and owing on the money, and had engaged in a fraudulent scheme to conceal from the Internal Revenue Service the fact that he, rather than Shorrock, had kept the money. Ap-

pellant had to convince Shorrock to maintain his false testimony before the grand jury in order to protect his own interest. Knowing that Shorrock was concerned about the fact that he had perjured himself before the grand jury and that Shorrock recognized that he might be assessed taxes by South Africa on the $650,000, appellant arranged the meeting between Shorrock, Soudan and attorney Locke. Soudan needed Locke to assure Shorrock that his false testimony before the grand jury would remain secret due to Fed.R.Crim.P. 6(e), which would preclude the disclosure of his testimony to the South African tax authorities. Appellant used the unsuspecting attorney Locke, without Locke's knowledge or consent, to perpetuate Shorrock's perjured statement that appellant paid him $650,000. Locke met with appellant and Shorrock in his capacity as Soudan's lawyer. Locke was simply interviewing a grand jury witness who had been called to testify against his client. No attorney/client relationship was formed between Shorrock and Locke.

### B

Even if we assume that Locke did give legal advice to Shorrock and there was an attorney/client relationship this court was willing to recognize,[7] the only potential for conflict at trial would arise from Locke's unwillingness or inability to use those communications due to their confidential nature.

■ It is well established that the defendant is denied the effective assistance of counsel in those instances where an attorney is unable to cross-examine, or is chilled in the cross-examination of, a government witness because of the attorney/client privilege arising from counsel's prior representation of the witness or from his duty to advance the interests of the witness as a current client. *United States v. Benavidez,* 664 F.2d 1255 (5th Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2936, 73 L.Ed.2d 1334 (1982); *United States v. Martinez,* 630 F.2d 361, 362 (5th Cir.1980), *cert.*

*denied,* 450 U.S. 922, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981). Even if there were an attorney/client relationship, the communications between Locke and Shorrock would not be confidential and would not impinge upon the right to cross-examination.

■ First, if some cognizable attorney/client relationship had emerged from Shorrock's two limited discussions with Locke, the subject matter of the conversations was not privileged since it was untruthful and was supportive of false statements made under oath. "Lawyer's skills may not be employed, even without their knowledge, in furthering crime." *In re: Grand Jury Proceedings, (Pavlick),* 680 F.2d 1026, 1028–29 (5th Cir.1982); *see also United States v. Harlson,* 754 F.2d 1155, 1167 (5th Cir.1985). The crime exception to the attorney/client relationship applies in this case, regardless of whether Locke knew at the time the true purpose of the meeting, as understood by Soudan and Shorrock.

■ Second, the communications between Shorrock and Locke were not confidential. Soudan, who had interests which were clearly adverse to Shorrock's, was present at all times during the meeting between Shorrock and Locke. Any discussions between Shorrock and Locke were intended by appellant for the purpose of having Locke determine what evidence was being presented to the grand jury against his client. Shorrock met with Locke at Soudan's request for Soudan's exclusive benefit.

■ Finally, even if there were confidentiality up to this point between Shorrock and Locke, that confidentiality was waived at trial when Shorrock testified as a government witness. Shorrock testified as to the full substance and detail of his conversations with Locke and the complicity with Soudan to commit perjury. Mr. Berg, co-counsel for the defense representing defendant Ghazou, cross-examined Mr. Shorrock extensively; Locke did not examine Shorrock because of defense counsel's pri-

---

**7.** In any event, there is no evidence in the record that Locke received any money from

Shorrock, recalling the old maxim that "free legal advice is worth what it costs ..."

or agreement that only one attorney would handle each witness.[8] In this case, counsel to examine Shorrock was Mr. Berg. The cross-examination took approximately six hours and took up one hundred sixty-three pages in the record, with numerous breaks, including an evening respite and a noon-day recess when Berg and Locke could confer about possible areas of cross-examination. Once Shorrock took the stand and waived confidentiality, there was ample opportunity to cross-examine Shorrock about the communications with Locke. Defense counsel did not delve deeply into the $650,-000 payment because of its trial strategy. In fact, the prosecutor's questioning on *direct* examination had revealed that Shorrock had given false testimony to the grand jury; Shorrock was an admitted perjurer. There was nothing hidden and nothing an alleged conflict of interest on Locke's part actually concealed from the jury. Berg had the obligation to cross-examine Shorrock for his own client, a duty which was unquestionably fulfilled. Further cross-examination would have proven nothing that was not otherwise before the court. Shorrock testified on direct he had lied before the grand jury; to maintain the false statements would have been futile given the overwhelming evidence that the $650,000 payment had never been made.[9]

### C

■ There was no conflict of interest due to Locke's role in the preparation of Soudan's tax returns. In those cases in which the trial defense counsel faces poten-tial liability for the same charges which are faced by his client, the defense counsel has an actual conflict of interest. *Government of the Virgin Islands v. Zepp,* 748 F.2d 125, 136 (3rd Cir.1984); *United States v. Salinas,* 618 F.2d 1092 (5th Cir.), *cert. denied,* 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980); *United States v. Crockett,* 506 F.2d 759, 761 (5th Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). The appellant's suggestion that Mr. Locke's potential liability for violations of the tax code affected his choice of trial tactics is speculative and without foundation.

The evidence is overwhelming that Soudan never paid Shorrock $650,000, and that the $650,000 is not reflected as an income item on Soudan's tax return. The only defenses available to appellant in these circumstances would be reliance upon the advice of counsel or, alternatively, that Locke had caused the preparation of a false return rather than Soudan. In either case, appellant would have to have made a full and complete disclosure of all the relevant information in order for the defense to be available to him. *United States v. Carr,* 740 F.2d 339, 347 (5th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1865, 85 L.Ed.2d 159 (1985); *United States v. Thaggard,* 477 F.2d 626 (5th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973).

■ "An alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible." *Foxworth v. Wain-*

---

8. On the first day of trial, the prosecutor raised the propriety of both Mr. Locke and Mr. Berg acting as co-counsel. Mr. Berg responded to Judge Bue's inquiry concerning this dual representation by stating that only one attorney would handle each witness; the format of alternating witnesses was merely to save time and raised no joint representation problem. Locke remained silent at this time and implicitly ratified this statement. Judge Bue fulfilled his duty to inquire about potential conflicts of interests by questioning defense counsel in open court. Locke was in the best position, professionally and factually, to assess whether there was a conflict of interest. It would be anomalous if the appellant could not benefit from his attorney's silence.

The government had previously raised the potential conflict of interest problem by way of a letter dated August 9, 1984 addressed to Judge Bue. The government was concerned that Mr. Locke and his law firm might have an interest in establishing the fact that they did not suborn Shorrock's perjury. In addition, the government expressed its concern that Mr. Locke or members of his law firm would be called as witnesses with regard to Soudan's attempts to launder the money from the crime. However, Locke was neither called nor subpoenaed to testify as a government witness nor did he "testify" via stipulation or argument in open court against Soudan.

9. See footnote 4.

*wright,* 516 F.2d 1072, 1080 (5th Cir.1975); *see also Nealy v. Cabana,* 782 F.2d 1362, 1364 (5th Cir.1986). The record in this case clearly establishes that neither reliance upon advice of counsel nor shifting of the blame to Locke was a plausible defense. Soudan purposely withheld the information from his attorney. Therefore, no conflict of interest is presented by Locke's involvement in the preparation of appellant's tax returns.[10]

## IV

The rest of Soudan's claims on appeal are also without merit.

■■■■ Appellant alleges that the government's theory of prosecution falls outside of the scope of the language of the indictment. An amendment to the indictment occurs when the offense proved at trial is not fully contained in the indictment because trial evidence broadened the possible basis for conviction from that which appeared in the indictment. *United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 1815, 80 L.Ed.2d 90 (1985). It is a long established principle that after an indictment has been returned its charges may not be broadened except by the grand jury itself. *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Adams,* 778 F.2d 1117 (5th Cir.1985). Courts must distinguish between constructive amendments of the indictment, which are reversible *per se,* and variances between indictment and proof, which are evaluated under the harmless error test. *Stirone v. United States,* 362 U.S. at 217, 80 S.Ct. at 273. Appellant argues that the district court should have instructed the jury that in order to find him guilty of the fraudulent scheme alleged in the indictment, it had to find that he knew the oil sold to South Africa was stolen or that the ship was to be sunk. According to appellant, the district court's failure to give this instruction resulted in an amendment to the indictment. Contrary to appellant's

contention, however, there was no modification to the indictment in this case.

Both the indictment and the proof at trial described a multi-faceted scheme among many players, each of them with a distinct role to play. Soudan was the man who actually negotiated with SFF and Merca Bank and convinced them to contract for oil and provided for the oil tanker. The government presented ample proof of appellant's integral role in the scheme and his necessary knowledge of all its details. Soudan knew that the bill of lading which originally said "Italy" was obliterated before being presented to the South African oil officials; he knew that he neither owned a refinery nor made arrangements for arrival of the oil in the United States; and he intentionally purchased a $12.3 million dollar oil tanker sight unseen, without even a maintenance check or inventory of the vessel.

■■■■ The district court's instruction that "what must be proved ... is that the accused knowingly and willfully devised or intended to devise a scheme to defraud substantially the same as the one alleged in the indictment," insured that the jury found, beyond a reasonable doubt, at least one part of the scheme sufficient to constitute a scheme to defraud. The court's instruction guaranteed the jury did not return a guilty verdict on a theory which broadened the scheme outlined in the indictment. The jury had a basis upon which to find the defendant criminally culpable within the scope of the indictment. No constructive amendment or prejudicial variance is evident from the record.

The trial judge did not err by overruling objections to testimony that Soudan paid for an abortion for his girlfriend. Soudan asserts that evidence regarding his expenditure of proceeds from the SALEM transaction to pay for an abortion for his girlfriend was not permissible at trial because it was either not relevant within the meaning of Rule 401 Fed.R.Evid., or if relevant, should

---

**10.** Soudan fails to proffer even an articulable basis in fact to believe that Locke would have some potential criminal liability arising from his role in the preparation of appellant's tax returns.

**930**

have been excluded pursuant to Rule 403 because of manifest prejudice.

■ This court does not entertain *de novo* review of this claim. "The Rule 403 balance, when struck by the district court in the first instance, will not be overturned on appeal absent an abuse of discretion." *United States v. Burton*, 737 F.2d 439 (5th Cir.1984); *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147 (5th Cir.1981). When reviewing the trial court's exercise of discretion to admit relevant but potentially prejudicial evidence, this court must look at the evidence in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect. *F. & S. Offshore, Inc. v. K.O. Steel Castings, Inc.*, 662 F.2d 1104 (5th Cir.1981).

■ The evidence about control of the proceeds from the SALEM transaction was clearly relevant to the issue of guilt at trial. Count 17 alleges that appellant filed an individual tax return which was false with regard to a material matter because the income was understated. If Soudan exercised sufficient dominion and control over the money to direct that it should be paid for an abortion, then it clearly should have been reflected as an income item on the return. The failure to include the receipt of that money is one of the elements of the offense charged in count 17. More-over, this evidence was relevant in light of appellant's assertions to the IRS, and his defense at trial, that the money made through the SALEM transaction belonged to a so-called "financing group." Obviously, if appellant exercised sufficient dominion and control over the funds to have spent some of these funds on procuring a private abortion, that undermines the financing group defense. Finally, control over the money is relevant to the issue of conspiracy to obstruct or impede the lawful operations of the Internal Revenue Service in the assessment and collection of tax (count 15) and false statements to the Internal Revenue Service (count 16). Proof that appellant paid for an abortion with the proceeds of the SALEM transaction established the falsity of the schedules he submitted to the IRS claiming that all the income from the SALEM transaction was used to pay legitimate business expenses. In any event, even if the evidence should not have been admitted, its impact was minimal. The evidence was adduced once in mid-trial and was not referred to again. It was relevant to counts upon which concurrent sentences were imposed and it could not possibly have affected the convictions on the fraud-related counts. Under the non-constitutional test for harmless error, the evidence complained of does not warrant reversal of appellant's conviction on any count. *See United States v. Jackson*, 588 F.2d 1046, 1056–57 (5th Cir.1979).

■ Finally, the prosecutor did not comment in closing argument upon Soudan's failure to testify. A prosecutor's argument will be deemed a reference to defendant's failure to testify if (1) such comment is the prosecutor's manifest intent or (2) it is of such a character "that the jury would naturally and necessarily" interpret the comment as such. *United States v. Benavidez*, 664 F.2d 1255, 1263 (5th Cir. 1982); *United States v. Austin*, 585 F.2d 1271, 1279 (5th Cir.1978). It is important to distinguish between those comments directed at the defendant's failure to testify and those directed at the defense's failure to counter or rebut evidence. The prosecutor is allowed to comment on "the failure of the *defense* as (opposed to defendants) to counter or explain" the testimony presented or evidence introduced. *States v. Hill*, 508 F.2d 345, 347 (5th Cir.), *cert. denied*, 422 U.S. 1009, 96 S.Ct. 42, 46 L.Ed.2d 43 (1975) (Emphasis by the Court). *United States v. Becker*, 569 F.2d 951 (5th Cir.), *cert. denied*, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978).

The record reflects that the prosecutor was not commenting upon appellant's failure to testify. Rather, he was commenting upon the fair and reasonable inferences to be drawn from the evidence which had been presented, and the defense theory which had holes in its web. The prosecutor's comments only served to focus that evidence which had been elicited during trial upon the government's theory of the case. The prosecutor did not comment on appellant's failure to testify nor was it his manifest intent to do so. It is equally clear that the jury did not naturally and neces-

sarily interpret the statement as a comment upon appellant's failure to testify.

Even if the prosecutor had commented on appellant's failure to testify, however, reversal would still not be appropriate. "Even though it appears that the defendant's constitutional rights were violated by the prosecutor's comments on his ... failure to testify, such violations need not lead to reversal if harmless beyond a reasonable doubt." *United States v. Edwards*, 576 F.2d 1152, 1154 (5th Cir.1978); *Chapman v. United States*, 547 F.2d 1240 (5th Cir.), *cert. denied* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977). In this case, the evidence of guilt was overwhelming. The court in its closing charge told the jury that no adverse inference was to be drawn from exercising the right not to testify. The court also admonished the jury to base its verdict only upon the evidence presented at trial and said the statements of counsel did not constitute such evidence. Under these circumstances, any error in the prosecutor's closing argument was harmless beyond a reasonable doubt.

AFFIRMED.