UNITED STATES of America,
Plaintiff-Appellee,

v.

Wesley A. CALDWELL, Jr.,
Defendant-Appellant.

No. 86–4614.

United States Court of Appeals,
Fifth Circuit.

June 26, 1987.

Leonard D. Van Slyke, Barry H. Powell, Thomas, Price, Alston, Jones & Davis, Jackson, Miss., for defendant-appellant.

Richard T. Starrett, George Phillips, U.S. Atty., Asst. U.S. Atty., Jackson, Miss., for plaintiff-appellee.

Before GOLDBERG, HILL and JONES, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Wesley A. Caldwell, Jr., was convicted under 26 U.S.C. § 7206(1) for knowingly filing a materially false income tax return after he failed to disclose on his 1978 tax return $180,000 that he received from Great Lakes Development Corporation (Great Lakes). Caldwell now appeals, arguing that the district court should have granted his motion to suppress statements given by him in an interview with Internal Revenue Service (IRS) agents, and that the court erred in refusing to exclude the testimony of an IRS agent concerning computations of earnings and profits of Great Lakes. We disagree with these contentions and accordingly affirm the judgment of the district court.

## I.

Caldwell and two associates bought Great Lakes to use as a corporate vehicle to purchase a steel plant in Buffalo, New York, in 1974. The funds for the purchase price of the plant were obtained through a loan from Deposit Guaranty National Bank to Great Lakes. Caldwell personally guaranteed the loan. Eventually, Caldwell became the sole stockholder in Great Lakes and thus the sole owner of the steel plant.

Great Lakes operated the steel plant for a few months, but because this operation was unprofitable, in 1975 it leased the plant to Aljax Steel Corporation (Aljax) for five years. The lease payments were $180,000 per year. Aljax made the payments for 1976, 1977, and 1978, but refused to make the 1979 or 1980 payments. Caldwell, through Great Lakes, brought suit against Aljax, and in 1983 recovered the final two lease payments.

In the meantime, a confidential informant reported to the IRS, the Criminal Investigation Division (CID), that Caldwell was diverting the lease payments to his personal use. None of these payments had been reported by Caldwell on his return. The CID, however, was reluctant to open a full-scale investigation without more distinct and substantial evidence of fraud.[1] Instead, that division referred the case as a "prime lead" to the Civil Examination Division for review.

In January 1982 an audit of Caldwell's 1979 Form 1040 was commenced based on the prime lead provided by the CID. Revenue Agent Bobby L. Bobbitt was assigned to conduct the examination. He began his investigation and soon found it necessary to review the 1980 tax year, and thus expanded the audit to include that year. In the course of his investigation, Bobbitt discovered that the lease payments were made for all years except for 1979 and 1980, the two years which Aljax had refused to pay.

On June 18, 1982, Bobbitt conducted an interview with Sharon Pepmiller, Caldwell's accountant. Following this interview, on June 22 and 23, Bobbitt wrote up a report referring the 1979 and 1980 tax years to CID for a criminal investigation for fraud by Caldwell. After completing the report and discussing the case with his manager, Norman Moranto, Bobbitt concluded that there was not enough information to refer the case to the CID.

Bobbitt and Moranto then held an interview on July 28, 1982, with Caldwell and Pepmiller. Pepmiller believed the purpose of the conference was to interview Caldwell in connection with the 1979 and 1980 audit "as more of a wrap-up type terminating the

---

1. Caldwell's 1976 and 1978 Forms 1040 had already been audited, and thus the IRS would have had to issue a reopening letter prior to re-examining those years. This factor apparently had some impact on the decision not to pursue a fraud investigation.

civil audit." Bobbitt, however, stated the purpose of the interview:

It's the policy to interview the taxpayer personally. I had not interviewed Mr. Caldwell up to this time, and I wanted to talk to Mr. Caldwell personally to get his views on what had happened. You know, just an initial interview, if you will. At that point we had several questions that we needed answered which I felt like Mr. Caldwell could answer. Not only that, but also Mr. Caldwell on several occasions through his CPA had told me lies, and I wanted to get those straight.

The interview was not mechanically recorded while it took place, but following it both Bobbitt and Moranto transcribed what had occurred.[2]

After conducting the July 28 interview, Bobbitt felt that there were still a number of questions that remained unanswered. He scheduled another interview for September 3 but Caldwell refused to meet him. Based on the responses and the unanswered questions stemming from the July 28 interview and other dealings with Pepmiller, Bobbitt became suspicious of the 1978 tax year. On October 5 he wrote a memorandum requesting that Caldwell's 1978 tax return be reopened, and on November 8 it was reopened. After further investigation, on January 6, 1983, Bobbitt referred Caldwell's 1978 tax return to CID for a criminal investigation.

Caldwell was subsequently indicted under 26 U.S.C. § 7206(1) for diverting the 1978 lease payment from Great Lakes to his personal use and not reporting the amount as income on his 1978 personal income tax return.[3] Caldwell filed a pretrial motion to suppress any testimony concerning the July 28 interview. The basis for this motion was his assertion that he was tricked into giving the interview by the IRS because it characterized the conference as relating to the civil audit of his 1979 and 1980 tax years, when in reality the interview was to obtain information leading to a criminal prosecution concerning his 1978 tax year. After an extensive suppression hearing, the district court denied the motion. Caldwell was tried, but the jury could not agree on a verdict and a mistrial was declared. After a second trial, Caldwell was convicted.

Caldwell now appeals raising two issues. First, he argues that the district court erred in denying his motion to suppress the statements he made during the July 28 interview. Second, Caldwell asserts that the court incorrectly refused to exclude the testimony of Bobbitt concerning the computations of earnings and profits of Great Lakes. We address each contention in turn.

II.

Caldwell makes two arguments in support of his assertion that the district court should have suppressed his testimony of the July 28 conference. He first argues that his statements were obtained by the IRS through fraud, trickery, and deceit, and thus should be suppressed. Caldwell also argues that the motion should have been granted because he had a fifth amendment due process right to rely on IRS regulations promulgated for his guidance. These regulations required Bobbitt to refer the investigation to CID once he had a firm indication of fraud, and since Bobbitt did not refer it, Caldwell relied on this fact to his detriment by granting the request for an interview.

A.

The basis of Caldwell's first assertion that his statements were obtained by the

---

**2.** The transcription is reprinted in full in the appendix to this opinion.

**3.** This section provides:
Any person who—
(1) **Declaration under penalties of perjury.** —Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;

. . . . .

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

IRS through fraud, trickery, and deceit is that the IRS misrepresented that the conference was civil in nature, when in reality it was a criminal investigation. He argues that this misrepresentation tricked him into giving the interview. To support his position, Caldwell relies on cases that hold that any evidence obtained by the IRS by fraud, trickery, or deceit has to be suppressed. *See United States v. Nuth*, 605 F.2d 229, 234 (6th Cir.1979) ("[G]enerally an affirmative misrepresentation by an IRS agent that the investigation is routine when in fact it is a criminal investigation requires suppression of evidence."); *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir.1977) ("It is a well established rule that a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue agent."); *United States v. Prudden*, 424 F.2d 1021, 1032 (5th Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

■ If Caldwell can prove that misrepresentations were made, and because of these misrepresentations he attended the July 28 interview, the evidence elicited from Caldwell at the interview would be inadmissible. In *Prudden*, this court set forth what the taxpayer must establish to require suppression of his statements to the IRS:

> We conclude that the mere failure of a revenue agent (be he regular or special) to warn the taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit and trickery. Therefore, the record here must disclose some affirmative misrepresentation to establish the existence of fraud, and the showing must be clear and convincing.

*Id.* at 1033 (footnote omitted). Thus, Caldwell must show by *clear and convincing* evidence that the IRS agents made *material* misrepresentations about the nature of the inquiry. We review the district court's finding regarding whether the IRS used fraud, trickery, or deceit under the clearly erroneous standard. *See Nuth*, 605 F.2d at 234; *Tweel*, 550 F.2d at 299.[4]

Caldwell argues that the district court erred in not finding that fraud, trickery, or deceit was used against him. He asserts that "[f]rom the outset, this was a criminal investigation. The matter had been referred by the Criminal Investigation Division of the IRS to determine whether there had been a criminal violation ... that Cald-

4. In deciding this issue, the district court held: The court, having considered the motion and briefs submitted by the defendant, the attachments to the government's Motion to Quash the Subpoena Duces Tecum, having heard extensive testimony on the issue, is of the opinion that the defendant has not established that the IRS agent, Bob Bobbit, considered that he—that there was a firm indication of fraud necessitating referral to the Criminal Investigation Division prior to the date the case was actually referred, that he did not attempt to trick or deceive the defendant, and that the defendant's motion should therefore be overruled. The court credits the testimony of Agent Bobbit to the effect that at the time of the July 28th, 1982, interview, he had only a first indication of fraud, that he had suspicions, but believed that legitimate questions remained before he could develop a firm indication of fraud. There is no evidence that Bobbit deliberately violated IRS regulations in continuing his investigation.... [T]he record here must disclose some affirmative misrepresentation to establish the existence of

fraud and the showing must be clear and convincing. The certified public accountant gave testimony based on her recollection, which was basically general, and which reflected her understanding, but there is not evidence that Mr. Bobbit made any misrepresentation, the court finds, to her or to the defendant. The court does not see any evidence of trickery, deceit or fraud, especially clear and convincing evidence on the part of the government agents and finds that Agent Bobbit proceeded in good faith in his attempt to get to the truth. There is no evidence that the defendant was in any way coerced into making a statement. The court also notes that there is no evidence of any attempt to control the civil investigation by the Criminal Investigation Division, nor is there any evidence of concerted action on the part of either division before the January 28, 1983 referral. Further, even if there were a firm *indication of fraud before the July 28th interview*, the defendant has failed to show that Bobbit's investigation was a deliberate or intentional effort to trick or confuse him.

well had not reported income obtained from lease payments to Great Lakes Development Corporation during the years 1975, 1976, 1977, and 1978." Caldwell contends that the CID referred the case to the civil division, which selected his 1979 return for examination, for the purpose of implementing the informant's tip that Caldwell possibly engaged in criminal tax violations.

■ The misrepresentation occurred, Caldwell contends, when Bobbitt represented to Pepmiller that the July 28 meeting only concerned the 1979–80 audit. Caldwell argues that the only possible reason for the interview was to investigate the anonymous tip referral regarding tax years earlier than 1979. As support for this assertion, Caldwell cites the following facts:

> At the time of the July 28, 1982, meeting, the IRS had already ascertained that (1) Defendant had received the Great Lakes lease payments for the years 1976–78; (2) there had been no 1979 lease payment; (3) the lease payments for 1975–78 had not been reported on Caldwell's individual tax returns; (4) and that Great Lakes Development had not filed any tax returns at all.

Based on these facts, Caldwell believes that the interview must have been to examine prior tax years because Bobbitt knew that Caldwell had never received a 1979 lease payment and there was no reason to question him about Great Lakes' activity occurring in 1979. Thus, Caldwell concludes Bobbitt misrepresented and deceived him by characterizing the interview as one dealing with the civil audit of the 1979 tax return, when the real reason for the interview was to discover information leading to the criminal prosecution of Caldwell for the 1978 tax year. We disagree.

First, we do not agree with Caldwell's statement that "[f]rom the outset, this was a criminal investigation. The matter had been referred by the Criminal Investigation Division of the IRS to determine whether there had been a criminal violation...." The evidence is to the contrary. In the referral letter from CID to the civil division, the CID states, "CID is reluctant to open a full-scale investigation and to re-open any tax year without more distinct evidence of fraud." Nowhere in the letter, or anywhere else in the record, is there evidence that CID was requesting that the civil division conduct a clandestine criminal investigation for it.

■ Also, after carefully reviewing the record, we do not find any clear and convincing evidence that Bobbitt desired to interview Caldwell on July 28 as part of an independent criminal investigation. Both Bobbitt and Moranto testified that the purpose of the meeting was to investigate the 1979–80 tax years. The district court credited this testimony. We do not find any evidence in the record to support a contrary conclusion. Moreover, when the court's finding is based in part on its assessment of the credibility of a witness, only in exceptional circumstances will we depart from such an assessment. *Travelers Indemnity Co. v. Calvert Fire Insurance Co.*, 798 F.2d 826, 836 (5th Cir.1986); *Ruiz v. Estelle*, 679 F.2d 1115, 1131 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

As additional support for the position that Bobbitt was not conducting a criminal investigation of tax year 1978 are the nature of the questions. Most of the questions at the July 28 interview do not deal with 1978 at all; instead, the questions were of a general nature relating to Caldwell's connection to the steel mill and Great Lakes. Only six questions out of 26 even mention 1978, and we do not see how these questions could possibly be part of a criminal investigation. Moreover, Bobbitt testified that the purpose of asking the questions relating to 1978 was to clarify questions he still had about Caldwell's connection with Great Lakes, not to investigate criminal acts occurring in 1978. The district court credited this testimony, and we cannot say it did so erroneously.

In sum, we cannot conclude after examining the record that Bobbitt made a material misrepresentation by asking Caldwell to meet with him to discuss the 1979–80 audit. We agree with the district court that the real purpose of this meeting was not to conduct a criminal investigation of

the 1978 tax year. We therefore hold that the district court's finding that Caldwell did not establish by clear and convincing evidence that the IRS agents used fraud, trickery, or deceit in gaining the interview with him was not clearly erroneous.[5]

### B.

Caldwell also argues that the motion to suppress should have been granted because he had a fifth amendment due process right to rely on IRS regulations promulgated for his guidance or benefit. The main thrust of Caldwell's argument is that Bobbitt had a firm indication of fraud prior to the July 28 meeting. At this earlier point, IRS procedures required Bobbitt to refer this firm indication of fraud to CID. Additional regulations then would require a Special Agent (one who does criminal investigations) to become involved and to notify Caldwell at the beginning of the interview that he was under criminal investigation. Because Bobbitt did not refer the case, and because Caldwell was never notified it was an interview connected with a criminal investigation, Caldwell asserts Bobbitt misled him into believing the investigation was civil, and he cooperated with that understanding. Thus, Caldwell contends his fifth amendment due process right to rely on the IRS regulations was violated.

■ We do not need to decide whether Caldwell has a fifth amendment right to rely on the IRS regulations, because this fifth amendment right asserted by Caldwell depends upon there being a violation of the regulations. There was no violation of any regulation. First, as we pointed out above, this was not yet a criminal investigation, and thus there was nothing to notify Caldwell about. Caldwell may also be contending, however, that while Bobbitt may not have been conducting a criminal investigation, he still had a firm indication of fraud and should have referred it to the CID. After examining the record we do not believe that Bobbitt had a firm indication of fraud prior to the July 28 interview, but rather only had a first indication.[6] The suppression motion is replete with testimony that neither Bobbitt nor Moranto had firm indications of fraud, but instead they were only suspicious, or merely had first indications of fraud.[7] Bobbitt testified that

Q: Indications of fraud, didn't you, Mr.—
A: I had some first indications of fraud, yes, sir.
Q: And your manual says when you have firm indications of fraud—
A: No, I didn't say firm. I said first. There's a big difference.

⋅ ⋅ ⋅ ⋅ ⋅

THE COURT: Well, do you take the position that at the conclusion of the July 29th conference there was a firm indication of fraud?
A: No, sir. Not at that time.
MR. VIOLANTI: July 28th, I believe.
THE COURT: I meant July 28th.
A: No. There were no firm indications at that time, not in my mind.

⋅ ⋅ ⋅ ⋅ ⋅

Q: Take July 28th, then.
A: July 28th we had indications—first indications, again, here.
Q: Preliminary indications.
A: Yes, sir. They were suspicions.
Q: But no firm indications.
A: No, sir, not at that time.

Bobbitt's supervisor, Moranto, also testified that they did not have a firm indication of fraud:

Q: And at least 1978 had already been audited.
A: Yes, sir. I am aware 1978 had been examined.

---

**5.** The district court's careful, well-considered findings and conclusions support our view that the court correctly decided this issue. In a situation such as the present one where the court conducted an extensive hearing, and then made credibility choices, we are especially hesitant to conclude the court erred in its decision.

**6.** The regulations distinguish between a firm indication and a first indication:

A firm indication of fraud must be distinguished from a first indication of fraud. A first indication of fraud can be described as a mere suspicion of fraud. Examiners are legally permitted and should endeavor to ask the taxpayer, the preparer, the representative, or any other involved party for an explanation of the "discrepancies" which are the basis of the examiners suspicion of fraud and any other question(s) which will resolve the question of the taxpayer's intent. The determination of firm indication of fraud is a factual determination which can only be determined on a case by case basis.

Internal Revenue Manual—Audit, § 4565.21, *reprinted in* II CCH IRM (Audit) at 8177–21.

**7.** For example, Bobbitt testified:

Q: You had some pretty strong suspicions [of fraud in 1978], though, didn't you?
A: I had some indications.

he only began to get a feel for the case after the July 28 interview. He did have suspicions earlier, but wanted to give Caldwell an opportunity to answer the questions he still felt were unresolved. Bobbitt testified that he felt Caldwell may have been able to satisfactorily answer these questions, and that he did not want to refer someone for a criminal investigation without first giving that person a chance to explain what was going on. Bobbitt pointed out why it was only after the July 28 interview that he developed a firm indication of fraud:

> The fact that the man would not grant us an interview, would not answer any more questions about the case; the fact that we went back and reevaluated the informant's report or prime lead and made the determination that we were in the wrong year. We were in '79 and '80, and this seemed to deal with '78, and that's when we requested the reopening of the '78 year. After we got the reopening, we tried to interview the taxpayer again to give him an opportunity to explain. We were denied the interviews, and subsequent to that we asked for an extension of the time on the '79 return and we were denied that, and that's when I wrote the case up. I felt like that I had given the taxpayer sufficient opportunity to explain to me why these items had not been reported or, if they were, where they were reported; and I never could get a satisfactory explanation.

In reviewing all the testimony at the suppression hearing, as well as other evidence in the record, we cannot say that the district court erred in its conclusion that Bobbitt did not have a firm indication of fraud prior to the July 28 interview.

A recent Fourth Circuit case reaffirms our view that the district court properly refused to grant the motion to suppress. In *Groder v. United States*, 816 F.2d 139 (4th Cir.1987), the taxpayer-defendant argued that the referral of his case to a special agent was improperly delayed and that he continued to provide testimony and records to the IRS in a civil auditing procedure long after a firm indication of fraud was evident. Thus, the taxpayer contended any information learned after the appropriate date of referral could not be used as the basis for a summons of his financial records. *Id.* at 142. The court disagreed.

The court in *Groder* first pointed out that the Audit Guidelines for examiners indicated that the referral decision was discretionary, and no absolute criterion established when an investigation should be suspended and the case referred for a criminal investigation. *Id.* at 143. The court also distinguished between a firm indication of fraud and a first indication or mere suspicion that fraud existed, noting that, "If a firm indication is taken to mean the same thing as a mere suspicion, taxpayers would be subject to fraud investigations as a matter of course, and 'the revenue agent would have to cease almost before he started his investigation.'" *Id.* (quoting *United States v. Lockyer*, 448 F.2d 417, 421 (10th Cir.1971)). The court believed that it was important, as expressed in the Guidelines,

Q: And you knew and Mr. Bobbitt knew that there had been nothing reported on the 1978 return about income from these lease payments from Aljax to Great Lakes. Correct?
A: There was nothing on there.
Q: Now, was this an indication to you at this time, Mr. Moranto, of any fraud on the part of Mr. Caldwell, that there had been lease payments from Great Lakes that he had received and that he had not reported them on his income tax?
A: No, sir. We had not discussed anything with Mr. Caldwell.
Q: But this was not an indication in any way that Mr. Caldwell might have been guilty of any fraud?

A: No, sir.
Q: Did you have, at that point in time, a firm indication of fraud in your mind with regard to 1978?
A: No, sir, I did not.
Q: Mr. Moranto, let me ask these questions to you this way: Prior to the July 28, 1982 meeting with the taxpayer, did you have a firm indication in your mind as to fraud with regard to the year 1978?
A: No, sir.
Q: Subsequent to the July 28, 1982 interview with the taxpayer and prior to its actual criminal referral the first of January 1983, did you have a firm indication of fraud as to the year 1978?
A: No, sir.

to develop the case in sufficient detail to be sure there is not an innocent explanation for unreported income and to develop the case sufficiently to allow CID to determine whether a criminal investigation is warranted. *Id.*

Partly because of these policy considerations the court in *Groder* declined to find that the IRS agent erred in not referring the case to CID earlier. The court held that the agent's interview with the taxpayer was not improper because the "purpose during the interview was to determine whether or not this taxpayer had a reasonable explanation for underreporting his income." *Id.* at 144. After the interview, finding the responses insufficient, the agent then referred the case to CID. The court held that delaying the referral in order to conduct an interview to see if the taxpayer had an explanation for not reporting income, and then after concluding the taxpayer did not, was proper. *Id.* We agree with the Fourth Circuit's rationale and holding, and find that case to be analogous to our situation and apply it to the present case.

Therefore, we affirm the district court's denial of Caldwell's motion to suppress the testimony of the July 28 interview.

### III.

Caldwell next argues that the district court erred in refusing to exclude the testimony of Bobbitt concerning the computations of earnings and profits of Great Lakes. He argues that it should be excluded because it was incompetent and prejudicial.

The main thrust of Caldwell's argument is that the testimony about the earnings and profits was irrelevant to the government's case that he knowingly filed a false income tax return for 1978, and that such testimony misled the jury and thus was prejudicial. Caldwell also argues that there were insufficient records to compute accurately the earnings and profits and that putting the burden on him to prove deductions violates the fifth amendment. Finally, Caldwell argues that the testimony of Bobbitt about the earnings and profits

should not have been admitted because he was not an expert and had no basis for reaching the conclusions that he did. We disagree with the first two assignments of error. Furthermore, since Caldwell did not raise the third issue below, we are precluded from considering it except under a plain error standard, and we do not find any plain error.

### A.

Caldwell's first argument is that any testimony concerning the earnings and profits of Great Lakes should not have been admitted because it was irrelevant. He bases the relevancy argument on the fact that the government's case did not depend on whether Great Lakes had any earnings and profits. In reviewing a district court's decision to admit testimony, this court is guided by the principle that the district court has wide discretion in determining relevancy, and its decision will not be overturned absent a substantial abuse of that discretion. *United States v. Silva,* 748 F.2d 262, 263–64 (5th Cir.1984). We do not find an abuse of discretion by the court in admitting this testimony.

Caldwell asserted that the Great Lakes operation was a losing business venture. Because of the losses, he contends that he was attempting to recoup his investment, and thus the $180,000 payment was either repayment of a loan to Great Lakes and not income, or it was a liquidation distribution. Accordingly, since he had not yet recovered his losses in the corporation, the payment was not income.

To counter the assertion that Great Lakes was going out of business and never made money, the government sought to introduce testimony by Bobbitt that Great Lakes had earnings and profits. We believe this testimony is proper rebuttal. The government was not attempting to elicit irrelevant information, but rather it was merely seeking to rebut the basis of Caldwell's defenses. The testimony at issue was relevant and therefore proper. *See United States v. Whiteside,* 810 F.2d 1306, 1309 (5th Cir.1987) (upholding admission of

exhibits on cross-examination and in rebuttal because they responded to a defense asserted by the defendant); *United States v. Stout,* 667 F.2d 1347, 1356 (11th Cir. 1982) (government's questioning of witnesses not irrelevant but was proper method of rebutting defendant's defense); *United States v. Watkins,* 537 F.2d 826, 827 (5th Cir.1976) ("The evidence was in any event admissible on the issue of predisposition to rebut the entrapment defense that Watkins counsel raised during his opening argument.").

■ Caldwell contends, however, that even if the testimony were relevant, it misled the jury and therefore was prejudicial and should have been excluded under Fed. R.Evid. 403. Rule 403 permits the trial court to exclude evidence otherwise admissible because the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice." Fed.R. Evid. 403. Rule 403, however, is an extraordinary measure because it permits a trial court to exclude concededly probative evidence, and thus it should be used sparingly. *United States v. Thevis,* 665 F.2d 616, 633 (5th Cir.), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). Thus, it is only when unfair prejudice substantially outweighs probative value that the rule permits exclusion. *Id.* (quoting *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)). We can reverse a trial court's ruling under Rule 403 only when there has been a clear abuse of discretion. *United States v. Frick,* 588 F.2d 531, 537 (5th Cir.), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979). When reviewing this exercise of discretion, we "must look at the evidence in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Soudan,* 812 F.2d 920, 930 (5th

Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

■ We do not believe that the district court abused its discretion in allowing Bobbitt to testify about the earnings and profits of Great Lakes. Caldwell argues, though, that the evidence should not have been admitted because it was too prejudicial. He asserts that the evidence misled the jury because it caused the jury to believe that Great Lakes had made money and those funds were under his control. First, we are not sure that a belief that Caldwell controlled Great Lakes' financial resources would make a difference in the jury's determination. Even if Caldwell had control of Great Lakes' funds, it does not necessarily mean that he would receive any corporate resources without declaring those funds as income. Moreover, we point out that this evidence would naturally be prejudicial, but that cannot be helped. We do not see any extreme prejudice resulting from this testimony that substantially outweighs its probative value.[8]

### B.

Caldwell also complains that Bobbitt had insufficient records to compute accurately the earnings and profits of Great Lakes and that putting the burden on him to prove deductions violates the fifth amendment. We disagree.

■ The corporation did not keep accurate or complete records. Bobbitt spent a large number of hours using the limited information that was available. He had as complete a picture as was available and based his computations on those available records. That is all he could do under the circumstances. A corporation cannot keep incomplete records, and then at trial have a principal of that corporation argue that since the government does not have an adequate basis to compute earnings and

---

**8.** In deciding that this evidence is not overly prejudicial, we note that Caldwell did point out to the jury that just because Great Lakes had earnings and profits did not also mean that a liquidating distribution or a repayment of a loan would be income to him. Thus, the jury was aware that the earnings and profits of Great

Lakes had no bearing on whether Caldwell had received income from Great Lakes and did not report it. Rather, this evidence merely countered Caldwell's assertion that Great Lakes was losing money and his argument that the $180,000 payment from Great Lakes was something other than income.

profits, such evidence cannot be admitted. Such a rule would foster incomplete record keeping. It would also be unfair to the government to allow Great Lakes to hide behind sloppy bookkeeping. Moreover, Caldwell had an adequate opportunity to prove that other deductions were available that should be considered in the calculation of earnings and profits. He also conducted extensive cross-examination of Bobbitt. Thus, the jury was well aware of any infirmities in the government's computations of earnings and profits and the nature of the government's proof.

■ Caldwell contends, though, that putting the burden on him to prove deductions violates the fifth amendment. Caldwell does not point out exactly how his fifth amendment rights were violated, and we do not see any violation of these rights. Perhaps Caldwell is arguing the government impermissibly shifted its burden of proving that Caldwell violated 26 U.S.C. § 7206(1) to him. If so, we disagree. The evidence concerning the earnings and profits was not part of the government's case-in- chief. It was used merely to rebut an argument raised by Caldwell. Thus, the government did not shift its burden of proof to Caldwell. Rather, the government was only establishing that a corporation, Great Lakes, had earnings and profits. This evidence was not needed to convict Caldwell. We see no fifth amendment violation.

### C.

■ Caldwell's last argument is that the testimony of Bobbitt about the earnings and profits should not have been admitted because under Fed.R.Evid. 703 he was not an expert and had no basis for reaching the conclusions that he did. Caldwell, however, did not raise this objection in the district court. Thus, we can only consider this issue under a plain error standard. *See Stout,* 667 F.2d at 1354. In *United States v. Brown,* 548 F.2d 1194, 1207 (5th Cir.1977), we described plain errors as "[errors] involving serious deficiencies which affect the fairness, integrity, or public reputation of the judicial proceed-

ings or which constitute obvious error." We find no plain error in this case. Bobbitt had been a revenue agent since December 1974. He has undergone extensive training in individual and corporate income taxes. He also was involved in the investigation of Caldwell from the outset of the case. Even assuming that Caldwell may not have qualified as an expert under Rule 703 on the earnings and profits issue, he was intimately familiar with this case and has had extensive training. There is no merit to this contention.

### IV.

For the foregoing reasons, we affirm the judgment of conviction of Caldwell.

**AFFIRMED**

### APPENDIX

The interview consisted of the following questions and answers:

Q: When did you buy the steel mill up north?

A: Which one?

Q: I don't know you tell me.

A: The foundry in Buffalo, New York? I lent the people who owned it the money to process ingots. When they went into bankruptcy, I got the building from the bank in 1978 and have been trying to sell it since.

Q: How much did you loan them?

A: I loaned them about $550,000.

Q: Is this the only steel mill you own?

A: Yes.

Q: You got the mill in 1978?

A: When the bank took them over, I received the building from the bank. They didn't go bankrupt.

Q: Did you operate the mill after you received it?

A: No. The building has been vacant since 1978.

Q: Then the buildings were never rented?

A: No.

Q: Who is the people who owned it? Who did you loan the money to?

A: Tom Hendrix, Bob Holliday, Dick Burnell.

Q: Are these individuals from the area up there?

A: Yes, around that area. I was put in touch with them by F.L. Cappert in Vicksburg.

Q: What do you know about Great Lakes Development Company?

A: Great Lakes owned the building.

Q: Then that's Hendrix, Holliday and Burnell?

A: There were three shares of stock in Great Lakes. I received all three in 1978 and destroyed two, and I own one share in Great Lakes now.

Q: Did you have any authority in Great Lakes Development prior to 1978 when the bank relinquished the building to you?

A: No.

Q: Who is Jack deJac?

A: He is the security man up there. He was a former employee of Strong Steel or Great Lakes.

Q: Who or what is Strong Steel?

A: Strong Steel operated it before Great Lakes.

Q: Then Great Lakes is a successor to Strong Steel?

A: I guess. I'm not sure.

Q: For clarification, you state you had no authority in Great Lakes prior to 1978?

A: No, I had none.

Q: Who is Frances Roberts?

A: She was my secretary until 12–80.

Q: Did she have anything to do with Great Lakes?

A: No.

Q: We have information which indicates that Great Lakes received rent payments of $180,000 and was deposited into Jackson area banks by Ms. Roberts.

A: Ms. Roberts kept the books of Great Lakes when they would send everything down here.

Q: What books?

A: I don't know. I will have to check.

Q: This was after 1978?

A: Yes. After I received the property, Ms. Roberts kept books from '78 forward.

Q: What is this about the Buffalo lawsuit?

A: We were trying to recover rent due in '78.

Q: We have information that indicates all rent was paid for 1978. Could it be for something else or maybe 1979?

A: I don't know. I will have to check. The attorney who handled that for me is no longer representing me. Mr. Tighe may have some information regarding this.

Q: Did you have signature authority or execute contracts on behalf of Great Lakes?

A: No, I will have to check. I exercised the normal authority that anybody would who had loaned them over $500,-000.

Q: You had no authority in Great Lakes prior to 1978?

A: Bob Holliday was Chairman, Burnell was President, and Hendrix was Vice President.

Q: Where were the returns filed for Great Lakes?

A: I have never filed a return for Great Lakes.

(Tr. 67–70)