UNITED STATES of America,
Plaintiff-Appellee,

v.

James G. NUTH, Defendant-Appellant.

No. 78–5324.

United States Court of Appeals,
Sixth Circuit.

Argued April 5, 1979.
Decided Aug. 30, 1979.

Mitchell Ehrenberg, Buckingham, Doolittle & Burroughs, James C. Herndon, Ronald L. Penner, Akron, Ohio, for defendant-appellant.

James R. Williams, U. S. Atty., James C. Lynch, Asst. U. S. Atty., Cleveland, Ohio, for plaintiff-appellee.

Before LIVELY and MERRITT, Circuit Judges and BROWN,* District Judge.

BAILEY BROWN, Chief Judge.

Appellant, James G. Nuth, was charged in four counts with fraud in connection with the preparation and filing of four gift tax returns for the years 1970, 1971, 1973 and 1974. All of the returns were filed in behalf of Nuth's aged aunt, Betty K. Owen, the donor. As to Counts I, II and III, it is charged in substance that Nuth willfully aided and assisted in the preparation of Owen's returns for the years 1970, 1971 and 1973 knowing that Owen had made substantial gifts in those years that were not included in the returns. In Count IV, it is charged in substance that Nuth willfully subscribed to a gift tax return for the year 1974 for Owen, verified under penalties of perjury, which return Nuth did not believe to be true in that it included transfers as being made in 1974 which actually had been made in 1973. Counts I, II and III are based on § 7206(2) and Count IV is based on § 7206(1) of 26 U.S.C., these provisions being set out in the margin.[1]

---

* Honorable Bailey Brown, Chief Judge, United States District Court for the Western District of Tennessee, sitting by designation.

1. § 7206. Fraud and false statements

Any person who—

**(1) Declaration under penalties of perjury.** —Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

**(2) Aid or assistance.**—Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether

Upon a jury trial, Nuth was found not guilty as to Count I and guilty as to Counts II, III and IV. The trial judge, Hon. Thomas D. Lambros, thereafter denied a motion for acquittal or for a new trial and also denied a supplemental motion for suppression of evidence, the latter motion being based on evidence alleged by Nuth to have been obtained after the trial.

Nuth has appealed and asserted various errors, and his most weighty contention has to do with the denial of the motion to suppress evidence. No issue is raised by the Government as to the timeliness of the motion.

## I

Nuth contends that from the time he was first interviewed by a Revenue Agent and thereafter, this case was viewed by the Internal Revenue Service (IRS) as a criminal matter. His motion to suppress is based on two separate but related propositions. The first is that such Revenue Agent did not give him the *Miranda*-like warnings required by two News Releases that had been issued by the IRS. Secondly, Nuth contends that the IRS fraudulently misled him with respect to the nature of the audit to be conducted by the Revenue Agent by a statement in an introductory letter sent to him by the Revenue Agent and also misled him by stating, in substance, at the beginning of the audit, that it was a "normal" or "routine" audit.

At this time, to explore such contentions, it is necessary to relate some events that occurred immediately prior to the audit performed by the Revenue Agent.

The investigation of Nuth's tax affairs began in a rather unusual way. It appears that in January, 1974, an IRS representative in Ottawa received information from the Royal Canadian Mounted Police that some United States citizens, including Nuth and some other persons from the Youngstown area, were suspected of attempting to carry out a fraud scheme in Canada. The alleged scheme apparently was to purchase stock of a corporation with washed funds derived from organized crime. This information item was ultimately passed to the IRS at Cleveland, with the result that Special Agent Marzich of the Intelligence Division reviewed the police file at Ottawa and also did some investigation of Nuth's affairs in the Youngstown area, such as his real estate transfers as reflected by courthouse records. Marzich then wrote a report to the Chief, Intelligence Division, at Cleveland via his group manager, Blaha. In this report Marzich stated that, while Nuth associated with racketeers, his involvement in a fraud scheme was "unknown." However, Marzich, based on financial statements he reviewed in Canada filed there by Nuth, stated that Nuth's increase in net worth did not comport with the income shown on his income tax returns. He also pointed out that, although Nuth had dealt substantially in real estate, there was no Schedule D (gains and losses from sales of capital assets) included in his income tax returns. Marzich recommended that an immediate audit of Nuth be made, Blaha forwarded Marzich's report recommending that Nuth be included in the Cleveland Strike Force Program as an audit target.

The Chief, Intelligence Division, at Cleveland was a member of the Selection Committee, and that Committee determined that Nuth should be included in the Special Enforcement Program (Strike Program) as an audit target. Thereafter, Joseph R. Morrow, a Revenue Agent, was assigned to audit Nuth and Morrow reviewed the Special Agent's report before beginning the audit.

On October 3, 1967, the IRS had issued News Release No. 897 that stated:

In response to a number of inquiries the Internal Revenue Service today described

---

or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document;

   *    *    *    *    *    *

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution.

its procedures for protecting the Constitutional rights of persons suspected of criminal tax fraud, during all phases of its investigations.

Investigation of suspected criminal tax fraud is conducted by Special Agents of the IRS Intelligence Division. This function differs from the work of Revenue Agents and Tax Technicians who examine returns to determine the correct tax liability.

Instructions issued to IRS Special Agents go beyond most legal requirements to assure that persons are advised of their Constitutional rights.

On initial contact with a taxpayer, IRS Special Agents are instructed to produce their credentials and state: "As a special agent, I have the function of investigating the possibility of criminal tax fraud". If the potential criminal aspects of the matter are not resolved by preliminary inquiries and further investigation becomes necessary, the special agent is required to advise the taxpayer of his constitutional rights to remain silent and to retain counsel. . . . IRS said although many special agents have had in the past advised persons, not in custody, of their privilege to remain silent and retain counsel, the recently adopted procedure insures uniformity in protecting the constitutional rights of all persons.

And on November 26, 1968, the IRS had issued News Release No. 949 that stated:

One function of a Special Agent is to investigate possible criminal violations of Internal Revenue laws. At the initial meeting with a taxpayer, a Special Agent is now required to identify himself, describe his function, and advise the taxpayer that anything he says may be used against him. The Special Agent will also tell the taxpayer that he cannot be compelled to incriminate himself by answering any questions or producing any documents, and that he has the right to seek the assistance of an attorney before responding.

Preparatory to beginning the audit, Morrow sent a letter to Nuth to arrange for a meeting with him, and the letter stated, *inter alia*:

We examine returns to verify income exemptions, and deductions. This does not always result in more tax due, nor does the selection of your return for examination imply dishonesty or suspicion of criminal liability.

Morrow then met with Nuth in August, 1974, initially interviewed him and thereafter met with Nuth on several occasions at which interviews were held and documents turned over to Morrow by Nuth. It is conceded by the Government that Morrow never gave the warnings set out in the News Releases. Nuth testified, which Morrow denied, that Morrow told him at the beginning that it was a routine audit. In any event, Morrow concluded that there were indications of fraud on the part of Nuth, not with respect to income tax, but with respect to the gift tax returns which he had aided and assisted in preparing. Thereupon, on recommendation of Morrow, Marzich, the Special Agent with the Intelligence Division, entered and took over the investigation that resulted in the instant indictment. It was the statements made by Nuth and the documents turned over by Nuth to the Revenue Agent, Morrow, that Nuth sought to suppress.

As stated, Nuth contends that this investigation was looked upon by the IRS as a fraud investigation from the time Revenue Agent Morrow began his audit, and from this proposition Nuth argues that the evidence obtained by Morrow should have been suppressed because of the admitted failure of Morrow to give the *Miranda*-like warnings provided in the News Releases. Alternatively, as stated, Nuth argues that suppression is required because of the claimed misrepresentation as to the nature of the investigation contained in the form letter and in Morrow's statement to Nuth at the inception.

The short answer to Nuth's suppression contention is that the trial court, after a full evidentiary hearing at which Nuth, Morrow, Marzich and the Chief of the Audit Division at Cleveland testified, found as a

fact that, with the evidence the IRS then had, this was not, at the time Morrow began conducting the audit, looked upon by the IRS as a criminal investigation; and such finding is binding on this court unless clearly wrong. (*United States v. Jobin*, 535 F.2d 154 (1st Cir. 1976)). In this connection, in its opinion denying the motion to suppress, the trial court said:

There is no doubt but that the original audit of defendant by the Internal Revenue Service was prompted by information from the Royal Canadian Mounted Police that James G. Nuth, as well as a number of other United States citizens, were under investigation in Canada for theft, embezzlement and use of stolen and/or counterfeit securities to fraudulently obtain bank loans in Canada. This information was initially evaluated by the Intelligence Division of the IRS. However, when passed on to the Audit Division of the IRS, the Audit Division handled the matter as "audit-only." It appears to the Court that while the origin of the audit entailed routing through the Intelligence Division, the audit itself was not conducted for any purpose other than determination of civil tax liability until such time as the case was referred back to the Intelligence Division on October 17, 1974. Upon such facts, IRS regulations would not require the "newsletter" warnings earlier, as defendants suggest.

The foregoing finding, we determine, is not clearly wrong. Since, however, the trial court chose to go further and deal with the suppression issue on the assumption that this was, for present purposes, a fraud investigation from the beginning, we will do likewise.

█ As pointed out by the trial court, the Supreme Court has held that *Miranda* warnings are not constitutionally required where taxpayers suspected of fraud, but who are not in custody, are questioned by Intelligence Special Agents of the IRS. (*Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976)). On the other hand, as also pointed out by the trial court, three circuits have held on due process grounds that failure to give *Miranda*-like warnings as provided by the News Releases does not require suppression. *United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970); *United States v. Heffner*, 420 F.2d 809 (4th Cir. 1970); and *United States v. Sourapas*, 515 F.2d 295 (9th Cir. 1975). Later, the First Circuit qualified its *per se* exclusion rule in *United States v. Jobin*, 535 F.2d 154 (1st Cir. 1976), and the Ninth Circuit held that it was applying the exclusionary rule only because such appeared to be the law of the circuit as established in *Sourapas, supra*. *United States v. Caceres*, 545 F.2d 1182 (9th Cir. 1976). In spite of the foregoing holdings, the trial court held that failure to give the warnings called for by the News Releases does not require suppression, and it based its ruling on some language in the Supreme Court in *Beckwith, supra*.

We determine that the holding of the Supreme Court after granting certiorari in *Caceres, supra*, requires our affirmance of the trial court on this issue. *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). In that case, the trial court had suppressed certain evidence obtained by a Revenue Agent who had a concealed radio transmitter on his person when interviewing a taxpayer who had offered a bribe. The basis for the suppression was the failure of the IRS to obtain the Attorney General's prior approval of the use of this consensual electronic surveillance as required by an IRS Manual. The Ninth Circuit affirmed, and the Supreme Court reversed.

It should be stated at this point that Nuth does not contend that he was aware of the existence of the News Releases and, in cooperating in the audit, relied on the failure of the Revenue Agent to give the warnings. (If Nuth had made such a contention, this would tend to support his theory of fraudulent inducement discussed *infra*.)

In its opinion, the Supreme Court stated the following, which we believe to be generally applicable here (at 755–756, 99 S.Ct. at 1473–1474):

Regulations governing the conduct of criminal investigations are generally considered desirable, and may well provide more valuable protection to the public at large than the deterrence flowing from the occasional exclusion of items of evidence in criminal trials.[23] Although we do not suggest that a suppression order in this case would cause the Internal Revenue Service to abandon or modify its electronic surveillance regulations, we cannot ignore the possibility that a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures.[24] Here, the Executive itself has provided for internal sanctions in cases of knowing violations of the electronic surveillance regulations.[25] To go beyond that, and require exclusion in every case, would take away from the Executive Department the primary responsibility for fashioning the appropriate remedy for the violation of its regulations. But since the content, and indeed the existence, of the regulations would remain within the Executive's sole authority, the result might well be fewer and less protective regulations. In the long run, it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form. (Footnotes omitted.)

We therefore conclude that even if this were considered by the IRS to be a criminal investigation at the time this audit on Nuth was begun, failure by Revenue Agent Morrow to give warnings provided for in the News Releases under the circumstances presented here would not require suppression.

The trial court recognized and the Government concedes that generally an affirmative misrepresentation by an IRS agent that the investigation is routine when in fact it is a criminal investigation requires suppression of evidence. The trial court, however, based on "the totality of all the circumstances," found that Nuth had not been effectively tricked or deceived by the Government. In this connection, the trial court pointed to the fact that Nuth is an attorney who practiced to some extent and is an experienced businessman, and that as such he must have been aware of the "potential criminal aspects" of an audit, citing *United States v. Stamp,* 147 U.S.App.D.C. 340, 458 F.2d 759 (1971). The trial court also relied on *United States v. Allen,* 522 F.2d 1229 (6th Cir. 1975), holding that suppression should not be granted unless there is a clear showing that the taxpayer was tricked or deceived. Since we cannot say that the trial court's finding that Nuth was not effectively tricked or deceived was clearly erroneous, we conclude that it must be affirmed as to such ruling.

## II

Nuth also contends that the trial judge erred in admitting into evidence his income tax returns for the years 1967 through 1974, contending that such were irrelevant. He asserts that these returns were prejudicial since they showed that, although he had had considerable taxable income during these years, he had paid very little taxes as a result of depreciation deductions he had taken on his real estate investments. It should be said at this point that a considerable part of the transfers made by Nuth's aged aunt, Owen, and which were contended by the Government to be gifts omitted from the gift tax returns, were transfers made to Nuth. Nuth contended that such transfers made to him were not gifts but were transfers to him of securities that Owen had purchased for him with funds that Nuth had turned over to her for investment for him. He contended that he had done this because his aunt was very successful with her investments. The Government contends that the income tax returns were relevant to show that Nuth had insufficient income or liquidity to allow him to send funds to his aunt for investment. Nuth responds that such was not a

valid basis for admission of the income tax returns into evidence because at trial he testified that he began sending funds for investment in the mid-30's and no longer sent funds after the early 1960's so that his income tax returns from 1967 through 1974 could not support the Government's contention as to admissibility.

Even if we assume, *arguendo,* that Nuth is correct as to his foregoing argument, we nevertheless conclude that the income tax returns were relevant for more than one reason. First, if Nuth had made numerous investments through his aunt prior to 1967 as he contends, income from such investments arguably would have appeared on his income tax returns. Moreover, as has been stated, Count IV is based on the allegation that the gift tax return for 1974 reflected a gift of stock to him actually made by Owen in 1973, and in support of this allegation, the Government pointed to dividends from the stock reflected on his 1973 return. Lastly, since Nuth prepared his complicated income tax returns, they tended to show his sophistication in such matters.

### III

With respect to Count III, which involved the gift tax return for 1973, Nuth contends that evidence introduced by the Government showed that the aunt, Betty K. Owen, who was very old and in a nursing home or hospital in 1973 when the gifts were allegedly made, did not have the capacity to form a donative intent. Thus, argues Nuth, he could not be guilty of fraud in subscribing to a gift tax return which omitted substantial gifts for that year because no effective gifts could have been made.

The Government did introduce evidence to show that Owen was in poor condition mentally in 1973. Owen had signed some documents with an "X," which Nuth had explained by stating that she had had a broken arm. Partly in rebuttal to Nuth's explanation and partly to show that her condition was such that Nuth could influence her, the Government introduced the evidence as to Owen's mental condition.

We do not believe that such evidence compelled a conclusion that Owen could not have formed a donative intent. In any event, in aiding and assisting in the preparation of Owen's gift tax returns for 1973 and 1974, Nuth impliedly admitted that she was capable of forming a donative intent at that time.

We thus conclude that the trial court was correct in ruling that Count III should not be dismissed on the ground that from the evidence the jury could not legitimately find the requisite donative intent.

### IV

Nuth also contends that the trial court erred in failing to dismiss Count IV because the IRS form no. 709 styled "United States Quarterly Gift Tax Return" filed for 1974 was not a "return" within the meaning of 26 U.S.C. § 7206(1). This contention is based on the proposition that Nuth signed the return only as preparer and that there is no signature on the line to be signed by the taxpayer. This document was prepared by Nuth and filed in behalf of Owen on November 27, 1974 after her death and after this tax investigation had begun.

At the outset, it should be noted that § 7206(1) is very broad in covering ". . . any return, statement or document . . . ." We agree with the trial court that the cases relied upon by Nuth are not applicable here. For example, *United States v. Hagan,* 306 F.Supp. 620 (D.C.Md. 1969) deals with venue, and *Butzman v. United States,* 205 F.2d 343 (6th Cir. 1953) simply holds that the statute of limitations began to run, not with the completion of an application for adjustment of an amortization deduction, but began to run when the application was filed with the IRS.

Since this form no. 709 for 1974 included the gift to Nuth that, the jury found, should have been included in the 1973 return, and was filed by Nuth after Owen's death and after the tax investigation had begun, Nuth certainly intended it to be a return and to head off a charge that this gift was not covered by a return. It is therefore the conclusion of this court that,

although the form no. 709 was not complete in that there was no signature by a taxpayer, it was a "return, statement or document" within the meaning of § 7206(1). Therefore Nuth's contention in this respect must be overruled.

Since this court has concluded that the trial court did not err in the admission of evidence or in denying the motion to suppress, for acquittal, or for a new trial, the judgment below is therefore AFFIRMED.