**UNITED STATES of America, Plaintiff,**

v.

**James Davis SMITH, Luther Rogers Wells, Defendants.**

**Crim. A. No. CR94–00018–BG(H).**

United States District Court,
W.D. Kentucky,
Bowling Green Division.

Jan. 6, 1995.

Steve Pence, United States Attorney's Office, Louisville, KY, for plaintiff.

R. Kent Westberry, Landrum & Shouse, Louisville, KY, Dominic Amorosa, New York City, for James David Smith.

George Salem, Jr., Franklin & Hance, Frank E. Haddad, Jr., Kenneth J. Tuggle, Robert C. Webb, Brown, Todd & Heyburn, Louisville, KY, for Luther Rogers Wells, Jr.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This case is before the Court on Defendant Wells' motion to suppress Bluegrass Industrial's corporate tax returns and other documents, which IRS revenue agents gathered during their civil audit. Defendant alleges that the revenue agents wrongfully investigated him for criminal conduct under the guise of a civil audit, and that they deceived him by giving misleading responses to inquiries, all of which caused a violation of his Fourth Amendment rights. The United States challenges Defendant's allegations and his standing to bring this motion.

The details, statements, coincidences and intentions which the parties now dispute concern an issue fundamental to our basic liberty: the right to be secure against unreasonable searches. Though Wells consented to the searches disputed here, courts must be on guard to protect citizens if such consent is obtained through some trickery or deceit. Otherwise, the Fourth Amendment provides no protection. At bottom this inquiry is fact intensive, with the events themselves as well as each actor's knowledge, understandings, and intentions being important considerations.

For the reasons stated herein, Defendant's motion is denied.

### I.

According to IRS internal procedures, revenue agents conducting a civil audit should continue the audit until they have a firm

indication of fraud committed by the taxpayer. At that point, the agents should immediately suspend the audit and refer the matter to the Criminal Investigation Division ("CID") of the IRS. Special agents at CID then continue investigating the taxpayer for criminal tax violations.

The timing of the civil and criminal investigations of Wells presents an unusual coincidence: the revenue agents conducted a civil audit of Defendant during approximately the same time period as the FBI conducted its criminal investigation. In this case, revenue agents began the civil audit of Wells and Bluegrass Industrial in January, 1994. During the Spring of 1994, the FBI was gathering evidence for criminal charges and conducting a grand jury investigation of Defendant. The revenue agents suspended the civil audit in September, 1994, turning the case over to CID. Soon after, at the end of September, Defendant was indicted on numerous charges, including two counts of assisting in the preparation and presentation of false corporate tax returns.

Among other things, Defendant Wells alleges that the revenue agents knew about the criminal investigation and grand jury proceedings conducted concurrently with the audit. Wells contends that the agents failed to suspend the audit even though they knew of its criminal nature and instead obtained documents, leads, and notes from conversations for use in the criminal case. Accordingly, Wells seeks suppression of the evidence gathered in the civil audit.

The government maintains that the FBI grand jury investigation and the IRS civil audit proceeded completely independent of each other. The FBI was developing a case against Wells on mail fraud and later, money laundering charges, not tax crimes. CID did not become involved with the FBI investigation until August 22, 1994, when the United States Attorney's office requested that CID participate in the grand jury investigation of Wells by looking into tax charges. The revenue agents referred their investigation of Wells to CID on September 6, 1994. Furthermore, according to the government, CID developed the information leading to the tax charges in the Indictment entirely from the FBI files, the grand jury, and its own efforts—not the efforts of the revenue agents who conducted the civil audit.

Because of the potential evidentiary problems posed by the concurrent civil and criminal investigations of Defendant, the Court conducted a lengthy suppression hearing during which the Court heard the testimony of IRS Revenue Agents Troy Johnson, Brad Keltner, and Terry Esch; IRS Special Agents Doug McEwen, Mike Thomas, and Neal VanMilligan; FBI Agent Ken Bowes; and Wells' CPA, John Taylor. In addition, the Court conducted an in camera review of the United States Attorney files, as well as the IRS civil and criminal investigatory files. Based on the evidence presented at the suppression hearing, the Court makes the following findings of fact.

Troy Johnson initiated the IRS civil investigation of Defendant in the spring of 1993. Johnson had previously audited Wells' returns in the 1970's and again in the 1980's. Wells was a prime candidate for audit because he retained interest in numerous companies and such taxpayers often misapply funds by paying normal living expenses out of corporate proceeds. In addition, Johnson's prior audits of Wells had been "productive." Wells' name was mentioned at a conference among FBI and IRS agents in early 1993. At about that time Wells had been the subject of numerous newspaper articles concerning his activities as Secretary of the Cabinet for Governor Wilkinson and his subsequent relationship with GTECH. Thus, for several independent reasons Wells' name had a somewhat high profile.

There is no evidence that Johnson had any specific information about ongoing misconduct by Wells at that time, or that any criminal investigatory unit asked Johnson to initiate an investigation based on prior findings.[1] The criminal investigation of Wells had yet to begin. The absence of evidence that Johnson had reason to believe or to

---

1. The fact that Johnson wrote "C.I.D." on the Wells audit file is simply not strong enough by itself nor in combination with other facts to draw the conclusion that Johnson began his investigation "at the request of the Criminal Investigative Division of the IRS."

suspect that Wells was involved in criminal activity makes creditable Johnson's own denials of any such knowledge.

In June, 1993, Johnson assigned the case to Revenue Agent Brad Keltner for audit. Keltner did nothing until late December, 1993, when he ordered Wells' past returns and sent Wells an information request.[2] Just after the new year, Keltner met with Special Agents Bob Brooks and Neal VanMilligan to see if they had any special leads concerning Wells.[3] Neither Brooks nor VanMilligan had any information other than a collection of newspaper articles. At this time, no other federal investigation of Wells had begun in Kentucky.

By February, 1994, the civil and criminal investigations had begun and proceeded virtually simultaneously, though independently. First, on February 1, Keltner reviewed materials at the office of John Taylor, Wells' CPA. On February 16, Keltner interviewed Wells, his bookkeeper Naomi Kinslow, and Taylor, again in Taylor's offices. Independent of these happenings, on February 16, 1994, at the request of the FBI office in New Jersey, FBI Agent Ken Bowes interviewed Billy Ray Adams regarding checks that Adams had received from International Marketing Concepts ("IMC") and Bluegrass Industrial in payment of debts owed by Defendant Smith. In March, Bowes continued this probe by interviewing Douglas Richards, an attorney who Wells hired to incorporate Bluegrass Industrial. There is no evidence that Revenue Agents Keltner or Johnson knew of this separate FBI investigation.

Wells and Taylor likely learned of the independent investigations, however, at least by April 5, 1994, the date Naomi Kinslow was subpoenaed to testify before the Grand Jury. Although various newspapers articles about Wells appeared before and after spring 1994, none specifically mentioned an investigation of money laundering or tax matters. On or about April 25, 1994, the United States Attorney's office requested Wells' individual tax returns from the IRS. The revenue agents, Keltner and Johnson, were aware of this request. Without knowing more, however, they had no reason to terminate the civil investigation. Keltner and Esch proceeded with the audit and focused upon Bluegrass Industrial's activities. This lead up to an interview with Mr. Wells on June 17, 1994.

Keltner testified that in June he had suspicions of fraudulent activity or "badges of fraud" as he called it, particularly as to Bluegrass Industrial's activities. Keltner testified that his suspicions at this time did not rise to the level of a "firm indication of fraud" and that he felt it necessary to follow prescribed policy and give Wells an opportunity to explain some of the apparent discrepancies that he had found.

For Defendant Wells, the critical conversations occurred in April and then in June. Taylor asked Keltner or Esch why the agents were making so many copies and asking so many questions. Keltner replied that he was merely building his audit file as Taylor would do if he was conducting an audit. In June, Wells asked a similar question, to which Keltner replied that he was merely trying to understand the entire scope of a particular transaction.

The IRS special agents, who conduct criminal tax investigations, knew little if anything about the civil audit. Special Agent VanMilligan provided nothing more than a few newspaper clippings to the revenue agents in January, 1994. FBI Agent Bowes and Special Agents and Thomas did not discover that the revenue agents were conducting an audit until late July, 1994.

By late July, 1994, the revenue agents were close to referring the case for criminal investigation. Keltner and Johnson had a series of meetings with McEwen and FBI Agents Bowes and Codispoti.[4] At the same time, the United States was becoming more interested in Bluegrass Industrial's affairs; Naomi Kinslow testified to the Grand Jury on August 18 and on the same date the

---

**2.** Obviously, this audit was not a high priority.

**3.** Johnson had mentioned to Keltner that VanMilligan might have some background information.

**4.** These meetings occurred on July 29, August 1, August 2, August 3 and August 8.

United States requested disclosure of tax return information for Bluegrass.

On August 10, Keltner conducted his last document review in Taylor's office. On September 6, the revenue agents referred the Wells and Bluegrass case to the IRS Criminal Investigation Division. Two weeks before, on August 22, the United States requested C.I.D.'s participation in the Grand Jury investigation. This particular sequence, of course, requires the closest scrutiny.

## II.

■ The documents Defendant Wells seeks to suppress are corporate documents, belonging to Bluegrass Industrial. The United States maintains that Defendant does not have standing to challenge the search and seizure of corporate documents. Wells argues that he does have standing by virtue of his position as president and sole stockholder of Bluegrass Industrial and his personal interest in the documents.

■ The rights guaranteed by the Fourth Amendment are personal rights, which "may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968). Therefore, an officer of a corporation has standing to challenge a corporate search and seizure if he has a reasonable expectation of privacy in the seized materials. *U.S. v. Mohney*, 949 F.2d 1397, 1403 (6th Cir.1991).

■ Important factors for determining whether Defendant had an expectation of privacy in the documents seized are whether he prepared the documents, whether the documents were seized from his personal office, and whether the search was directed at him personally. For example, a defendant has standing if he was the organizer, sole shareholder, and president of the corporation, who prepared much of the material seized from his office, where he spent the greater part of the working day. *Henzel v. United States* 296 F.2d 650 (5th Cir.1961). When the documents seized are normal corporate records not personally prepared by the defendant

and not taken from his personal office, desk, or files in a search that was not directed at him personally, the defendant cannot challenge the search. *United States v. Britt*, 508 F.2d 1052, 1055 (5th Cir.1975).

Defendant's status as the sole shareholder of Bluegrass, without more, does not confer him with a reasonable expectation of privacy in the seized materials and therefore, does not entitle him to assert the Fourth Amendment rights of the corporation. *Williams v. Kunze*, 806 F.2d 594, 599 (5th Cir.1986); *Lagow v. United States*, 159 F.2d 245, 246 (2d Cir.1946).

Due to the nature of the audit, Wells did have an expectation of privacy sufficient to convey standing to challenge the "seizures" here. The revenue agents asked questions and requested documents relevant to an audit of all of Wells' financial ventures. Distinguishing whether the answers and documents Wells produced are purely business-related rather than personal is difficult to do. The Revenue Agents sought information about all of Wells' activities to get the full picture of his financial dealings. The corporate documents seized involved business dealings that Wells managed personally, not ventures in which Wells did not participate.

## III.

■ The Court must now consider whether the government used a civil audit to obtain evidence for its criminal prosecution of Defendant Wells by trick or deceit.

■ Evidence obtained in the course of a criminal investigation, where the defendant has not been apprised of the nature of the investigation, may be suppressed only if the defendant establishes that: (1) the civil revenue agents had "firm indications of fraud" by the defendant, (2) there is clear and convincing evidence that the IRS affirmatively and intentionally misled the defendant about the nature of the investigation, and (3) the IRS's conduct resulted in prejudice to defendant's constitutional rights. *U.S. v. Grunewald*, 987 F.2d 531, 534 (8th Cir.1993).

The Court cannot conclude that the contacts between the civil and criminal investigations gave the revenue agents firm indica-

tions of fraud. The testimony demonstrates considerable detachment of the revenue agents from other ongoing investigations. At first blush it may seem astonishing that the various newspaper articles did not cause the revenue agents to inquire about the activities of others in the government. However, there is no reason for the revenue agents to have suspected that tax charges were the focus of other ongoing criminal investigations. And, for good reason: tax charges were not the focus.

Additionally, there is no evidence, other than certain coincidences of timing, that the civil and criminal investigations were coordinated in some manner.[5] If unlawful conduct had occurred, stronger evidence than the mere coincidence of some events would exist. No evidence suggests that information passed in any form between the revenue agents and those conducting a criminal investigation.

The January 1994 meeting between Revenue Agent Keltner and Special Agents Van-Milligan and Brooks did not provide the revenue agents with firm indications of fraud. Defendants argue that this meeting proves that the civil audit had criminal overtones from the beginning. The Court finds, however, that the special agents did not have the requisite knowledge about any potential criminal aspects of this case which they might have disclosed to Keltner. The special agents provided only newspaper clippings. A firm indication of fraud requires significantly more knowledge and evidence than either the special agents or the revenue agents possessed at the outset of this case. *See, e.g., U.S. v. Caldwell*, 820 F.2d 1395 (5th Cir.1987) (finding no firm indication of fraud when an audit began based on a confidential informant's report that the defendant was diverting lease payments for his personal use until the IRS had specific evidence of tax fraud or nonpayment). The Court can conclude that the agents had firm indications of fraud only by completely disbelieving the

testimony of the agents and by assuming knowledge and intent on their part for which there is no actual proof. The Court finds no reason to do so.

The Court also cannot conclude that the revenue agents independently discovered firm indications of fraud in their audit prior to preparation for referral of the case to CID. In particular, the sequence of events between July 29 and September 6 raises two issues that merit close scrutiny: (1) whether the revenue agents had or obtained firm indications of fraud long before referring the case to C.I.D., and (2) whether they passed along information obtained during the audit to any criminal investigatory authorities. The revenue agents deny wrongdoing in regard to either question. The evidence is insufficient for this Court to interpose a suspicion as fact. There is no evidence that either the United States Attorney or the IRS Special Agents assisted the civil audit in any way. Indeed, as of late July, neither had commenced a direct tax fraud investigation. The United States had not yet obtained Bluegrass Industrial's tax returns. Nor is there evidence that any information discovered in the civil audit found its way to criminal investigatory authorities.

■■■■ To be certain, the revenue agents were suspicious about some of Bluegrass Industrial's tax reports. However, these suspicions did not amount to a firm indication of fraud. The agents followed prescribed procedures and gave Wells the opportunity to explain the discrepancies they discovered. The facts of this case do not support second-guessing the revenue agents.[6] For good reason, revenue agents are given considerable discretion in making the "firm indication of fraud" determination. More importantly, the agents must give an individual the opportunity to explain any unusual conduct. The evidence is insufficient to sustain a finding that the agents behaved inappropriately.

---

5. The Court does not consider the asserted similarity of questions the government asked Naomi Kinslow at the Grand Jury and those Agent Keltner asked Defendant Wells to be so striking and unlikely under the circumstances to raise suspicion.

6. The Court does not suggest that the revenue agents would have been wrong to refer the case sooner. Arguments for an earlier date of firm indications of fraud are not necessarily untenable. The evidence is simply insufficient to bring the revenue agents to that conclusion.

■ Defendant argues that Keltner's statement to Taylor, Wells' CPA, that he was making so many copies and asking so many questions to build a civil audit file was an affirmative effort to mislead Defendant. Defendant must establish that the revenue agents affirmatively and intentionally made misrepresentations about the nature of the audit. The mere failure of an IRS agent to inform a defendant that information developed in an audit may result in criminal charges does not indicate affirmative and intentional deceit by the IRS. *U.S. v. Marra*, 481 F.2d 1196, 1203 (6th Cir.1973).[7]

Defendants likens the circumstances of this case to *U.S. v. Tweel*, in which the Fifth Circuit found the revenue agent's failure to apprise the defendant of an investigation's criminal nature to vitiate the defendant's consent to a later search and seizure of tax documents, in violation of the Fourth Amendment. 550 F.2d 297 (5th Cir.1977). The Fifth Circuit's conclusion in *Tweel*, however, is based upon two factual premises not found here: (1) the obviously criminal nature of the civil audit, as evidenced by its initiation at the specific request of the Organized Crime and Racketeering Section of the Justice Department, and (2) the intentional and material misrepresentation of the nature of the investigation made by the revenue agent through a silent response. The Wells civil audit investigation was neither obviously criminal in nature nor specifically requested by a government criminal investigatory agency.

In *Tweel*, the revenue agent's conduct was misleading because he actually knew the investigation was criminal by virtue of the express referral source. Here, it would be a great distortion to label this case a referral from C.I.D. Furthermore, Agent Keltner did not know that the case had a criminal investigatory background or initiation and no evidence suggests that it did. Consequently, Keltner could not be and, indeed, was not guilty of making a misrepresentation of the

character which Judge Fay found so reprehensible in *Tweel*. Whether the audit was "routine" is not determinative. Taylor says that Keltner's comment led him to believe that the audit was "routine," notwithstanding his testimony that the audit was the most thorough that he had ever encountered. The Court, having heard and evaluated the live testimony of both Keltner and Taylor, does not construe the exchange to be misleading under the circumstances.[8] The evidence here fails to show clearly and convincingly, or otherwise, that the IRS deceived Wells by proceeding with its civil investigation when its own revenue agents knew that fraud had occurred or that criminal sanctions were likely.

■ Lastly, Defendant has been unable to prove that he was actually deceived about the nature of the audit. To win suppression, Defendant must show that he was effectively tricked or deceived by the revenue agents into believing that the nature of the audit was a civil rather than criminal investigation. *United States v. Nuth*, 605 F.2d 229, 234 (6th Cir.1979); *see also United States v. Allen*, 522 F.2d 1229, 1233 (6th Cir.1975). Then, Defendant can argue that his consent to later interviews or seizures of documents was invalid.

This Court will not imply any special knowledge or expertise to Wells. But the Court will look at what Wells knew or undoubtedly learned to determine if he was deceived unlawfully. The evidence shows two simultaneous investigations, each with a different focus and origin, that overlap in their concern about Wells' business affairs. Wells or his agents knew of the FBI investigation in March when he learned of the Grand Jury subpoenas and possibly of FBI interviews with Richards and Adams. Taylor knew that a civil audit of this intensity could lead to criminal charges. He knew that the Grand Jury was asking about some of the same documents, though perhaps with

---

7. Defendant correctly points out that concept cannot be applied indiscriminantly. The Court is well aware that determining whether this rule applies depends entirely on the facts and circumstances of a given case. Consequently, the Court will not apply the rule blindly.

8. Taylor knew that this audit was a thorough one and he certainly understood that such an audit could lead to fraud charges. Taylor did not ask for nor was he given a statement to the contrary.

a different focus. In sum, the evidence suggests that Wells or his agents knew more about the simultaneous proceeding of the two investigations than did the IRS or the FBI. Mr. Taylor's testimony alone is not strong enough to support clear evidence of deceit.

For these reasons, Defendant's motion to suppress Bluegrass Industrial's documents is denied. The Court will issue an order consistent with this Memorandum Opinion.

## ORDER

The Court, having considered the parties' arguments, having issued a Memorandum Opinion, and otherwise being sufficiently advised,

IT IS HEREBY ORDERED that Defendant Wells' motion to suppress is DENIED.