*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0039p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JON RUTHERFORD (07-2312), JUDITH
BUGAISKI (07-2313),

*Defendants-Appellees.*

Nos. 07-2312/2313

>

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-20207—Marianne O. Battani, District Judge.

Argued:  October 21, 2008

Decided and Filed:  February 4, 2009

Before:  BOGGS, Chief Judge; and COLE and COOK, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**   Robert Cares, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant.  Steven F. Fishman, Robert M. Morgan, LAW OFFICE, Detroit, Michigan, for Appellees.  **ON BRIEF:**  Robert Cares, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant.  Steven F. Fishman, Robert M. Morgan, LAW OFFICE, Detroit, Michigan, for Appellees.

BOGGS, C. J., delivered the opinion of the court, in which COOK, J., joined. COLE, J. (pp. 13-14), delivered a separate concurring opinion.

———————————

## OPINION

———————————

BOGGS, Chief Judge.  Defendants Jon Rutherford and Judith Bugaiski were charged with numerous tax violations and conspiracy to defraud investigators from the Internal Revenue Service (IRS).  The United States appeals the district court's suppression of certain statements and documents obtained pursuant to an allegedly improper civil investigation.

1

The IRS civil examiners who interviewed Rutherford and Bugaiski were required under an IRS manual to suspend their investigation when a "firm indication of fraud on the part of the taxpayer[s]" surfaced and refer the case to the criminal division. Internal Revenue Manual § 4565.21(1). Despite the fact such indications had emerged, civil examiners continued their investigation, conducting further interviews with the defendants and requesting additional documents.

In the criminal proceedings that followed, the IRS sought admission of their incriminating statements. The district court held the statements had to be suppressed, initially citing *United States v. McKee*, 192 F.3d 535 (6th Cir. 1999), for the proposition that any continuation of discussions under a civil audit after firm indications of fraud have emerged would violate the Due Process Clause of the Fifth Amendment. ; JA 81. At a later hearing, the court narrowed its explanation orally, remarking that not every "violation of the [IRS] manual [creates] a per se constitutional violation," but that this case did establish a violation. The United States now appeals, contending that the district court misread the Sixth Circuit's precedent and that the defendants' statements were improperly suppressed.

Because the defendants' constitutional rights were not violated by the IRS's negligent violation of its manual, we reverse the district court. Despite the district court's reliance on *McKee*, in that case the Sixth Circuit explicitly reserved the issue now before us. Whether the government violates a person's due process rights in the course of taking his statement is assessed under a voluntariness standard, and the Constitution does not demand a bright-line rule whereby every breach of federal administrative policy also violates the Due Process Clause. The Fifth Amendment is implicated only when a federal agent's conduct actually compels a person to speak against his will. With respect to Rutherford and Bugaiski, there is no credible basis for concluding that their statements were coerced. Although the civil examiners may have been negligent in failing to refer the case to the IRS's Criminal Division, the district court found no evidence that they deliberately disregarded the manual in order to mislead the defendants. Nor is there evidence in the record that suggests Rutherford and Bugaiski were familiar with the manual, or that they were lulled into a false sense of security about the nature of the charges they might face. In short, their statements were given voluntarily and may be properly admitted into evidence without infringing upon their constitutional rights.

I

Rutherford and Bugaiski were both officers of Metro Emergency Services (MES), a non-profit tax exempt organization operating a homeless shelter for women in Highland Park, Michigan.  Rutherford served as the organization's president, and Bugaiski served as its controller.  The IRS first became interested in MES when a newspaper article reported on political contributions made by the group.  As a non-profit organization, such disbursements could affect the group's tax status.  In the course of reviewing the IRS filings, agent Wesley Tagami of the Tax Exempt and Government Entities Division discovered that MES had not filed several forms related to tax withholding from employee salaries.  At this point, no direct evidence of fraud had surfaced, as there was no indication that Rutherford or any other employee had not reported all income.  But Tagami's findings suggested there was the potential for fraud and, noting the irregularity, he referred the case to a fraud specialist.  Soon thereafter, several other agents were assigned to work on this case, including Suzanne Carene, a revenue agent, who was tasked with examining the organization's tax returns, and another agent who was charged with collecting any unpaid taxes from MES.

Some indications of fraud began to emerge.  Agents discovered that Rutherford's personal tax return showed that taxes had been withheld from his pay, even though MES never remitted the money to the IRS.  Still, agents believed no firm indications of fraud were yet apparent, because certain elements of criminal fraud remained unsupported by the records.  As the government notes, "there could be innocent explanations for the problem with the returns, such as Rutherford's lack of knowledge about the non-filings of 941s or the fact that the funds had not been remitted to the IRS."  Since a taxpayer's intent is crucial to the distinction between criminal and civil fraud, agents could not determine whether there was an innocent explanation for the discrepancy or if the omission was intentional and therefore potentially criminal until they interviewed Rutherford and Bugaiski.

Agent Carene met with the defendants and their CPA for the first time on December 16, 2003.  Rutherford and Bugaiski stated that their failure to remit taxes was unintentional, and that funds owed to them had come in late.  Rutherford thereafter abruptly ended the interview.  Agent Carene attempted to continue the interview, but the defendants refused to

answer any more questions.  She then made several requests to meet with the defendants again for further questioning, and when they declined, she caused a summons to be served on the defendants.[1]  Pursuant to the summons, Carene met with defendants on June 17, 2004.  At that time, Bugaiski turned over various documents, but no interviews were conducted.  On June 21 and June 25, 2004, Carene interviewed Rutherford for a second and third time.  In the course of these interviews, he answered some questions and declined to answer others.  On June 23, 2004, she interviewed Bugaiski.

IRS agents involved in the case held a conference call on July 20, 2004, and finally determined that a criminal referral should be made.  Explaining the decision later, one investigator said, "I believe we had enough, or we had affirmative acts that showed intent and willfulness by the taxpayer to fail to collect and turn over the employment taxes, not report substantial amounts of income, not file tax returns . . . ."  On April 21, 2006, defendants were charged in a 22-count indictment alleging various violations of the tax code, including tax evasion, failure to pay taxes that were withheld from employees, making false returns, and conspiracy to defraud IRS investigators.  In a pre-trial motion to suppress evidence and dismiss the indictment, the defendants claimed that the IRS agents improperly continued the civil examination after firm indications of fraud had emerged.  By doing so, the defendants argued, their rights under the Due Process Clause had been violated.  The district court agreed that statements made in the later stage of the investigation had to be suppressed as violating the Constitution.

II

The district court found that firm indications had emerged by the time the IRS conducted its second round of interviews in June 2004.  Although the United States did not concede this point on appeal, the government paid little attention to this issue in its brief and at oral argument—perhaps in recognition of the standard of review.  Whether

---

[1]Rutherford and Bugaiski were not served as officers of MES.  Rather, they were summoned for their involvement with DPR Management, Inc.  Rutherford was a controlling owner of DPR, and Bugaiski was DPR's custodian of records.  DPR purchased the MES building for $1,000 in late 1998, and in turn, MES paid hundreds of thousands of dollars a year in rent to DPR.  With this money, DPR made a number of political contributions.  A separate investigation of DPR's dealings was already underway.

firm indications of fraud had emerged is a question of fact, and this court reviews such findings for clear error. *McKee*, 192 F.3d at 543. Nothing in the record suggests the district court's finding was clearly erroneous, and therefore we proceed on the assumption that the IRS civil investigation was improperly continued.

The Sixth Circuit has once before considered the issue now before this court, and this case has proven a source of some confusion. In *United States v. McKee*, the defendant asked this court to suppress statements made to the IRS because the statements had purportedly been made pursuant to an improper investigation. 192 F.3d 535. In an opinion for the court, Judge Jones first set forth the traditional rule for determining whether a statement should be suppressed:

> [I]t is incumbent upon [the defendant] to show by clear and convincing evidence that (1) [the revenue agent] made affirmative misrepresentations in the course of her investigation, and (2) because of those misrepresentations, [the defendant] disclosed incriminating evidence to the prejudice of her constitutional rights.

*Id.* at 542. In this respect, the opinion is wholly conventional. Although defendant's motions to exclude statements she made to the IRS were based on an allegation that the revenue agent had failed to refer the case to the Criminal Division after firm indications of fraud surfaced, the district court found that the manual had *not* been violated and therefore denied her motions. *Id.* at 540-41. The Sixth Circuit affirmed this decision, again relying on the fact that the manual had not been violated. *Id.* at 543 ("Far from disregarding the Manual's provisions, [the IRS] acted in complete conformance with them by contacting the McKees and offering them the chance to account for the improprieties alleged by Pique and the other anonymous source.").

Only in dicta did the lead opinion in *McKee* touch on the issue we are now asked to resolve. After affirming the district court's finding that the IRS manual had not been violated, the opinion departed from the well-established rule, elaborating, "[The defendant] can satisfy her burden, as a practical matter, by showing that [the revenue agent] knowingly failed to comply with the Manual's suspension-of-investigation rules." 192 F.3d at 542. Judge Jones also added a footnote, explicitly stating: "If the revenue

agent continues the civil audit even after she has developed 'firm indications of fraud,' then she is, in fact, making affirmative misrepresentations to the constitutional detriment of the taxpayer because she is gathering criminal evidence against the taxpayer under the guise of a civil proceeding." *Id.* at 542 n.5.

Although Judge Jones's analysis may serve as a persuasive authority, it does not bind this panel in resolving this issue today. *See Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006) (holding that dicta is not binding precedent). Further undercutting the district court's reliance on *McKee* is the fact that the two other judges on that panel explicitly stated that this issue was not being decided. Writing separately, Judge Nelson observed,

> Because we conclude that agent Loges was not shown to have violate the Internal Revenue Manual in failing to turn the investigation over to the Criminal Investigation Division sooner than she did, I am not sure that we need to express an opinion as to what the constitution implications would have been had we concluded that Agent Loges did violate the manual. . . . I do not mean to suggest that I think the rule is wrong; I simply see no reason for us to decide the question at this juncture.

*McKee*, 192 F.3d at 545 (Nelson, J. concurring). Judge Norris joined Judge Nelson's concurring opinion, so Judge Jones's discussion of the Due Process Clause would not be controlling even if it were not dicta. For these reasons, the trial court's reliance on *McKee* is problematic. Now that the issue is before us, we are free to reach a contrary conclusion. And a different result is warranted, because merely failing to refer a case to the Criminal Division pursuant to the IRS's internal policy is not alone sufficient to establish a violation of the defendants' right to due process.

The Due Process Clause of the Fifth Amendment provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." Violating this right entails government conduct that "shocks the sensibilities of civilized society." *Moran v. Burbine*, 475 U.S. 412, 433-34 (1986). The sort of conduct at issue may be proscribed by internal government policy, or in certain cases, the government may even have a policy of engaging in the objectionable behavior. Whether a person's due process rights were violated in the course of taking his statement hinges on the voluntariness of

the statement.  *Colorado v. Connelly*, 479 U.S. 157, 166 (1987); *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003).  So the effect of the government misconduct on the defendants, not its mere existence, is what must guide our analysis.  Consequently, the IRS's failure to refer a case cannot *of its own force* violate the Due Process Clause, and to find otherwise would radically overstate the protections afforded by the Fifth Amendment.  In this case, the district court said that the IRS agents were "perhaps" negligent in failing to refer the matter to the Criminal Division, but that there was insufficient evidence of intentionality to find that the failure to refer was deliberate.  The record reveals that the agents knew of the manual and were sensitive to its requirements well before their first interview with the defendants.  But whether the agents were acting deliberately or merely negligently, the failure to refer a case, standing alone, does not demonstrate a lack of voluntariness in the defendants' statements, absent evidence that the defendants were in fact compelled to talk by the government's affirmative misrepresentations.

There is no bright-line rule for determining whether a suspect's statements were given voluntarily.  Voluntariness is instead judged by the "totality of the circumstances" in which the person made the statement.  *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001).  To frame this analysis, the Sixth Circuit has set forth three factors for courts to consider: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).  Nothing in the record of this case suggests that IRS agents made affirmative misrepresentations to Rutherford and Bugaiski, or that defendants' will was overcome by the circumstances of these interviews.  That a summons was issued cannot on its own mean that their later statements were involuntarily given, because the statements of persons who are subpoenaed by grand juries are routinely admitted in criminal proceedings against them.[2]

---

[2]Indeed, the district court properly recognized the authority of grand juries to gather evidence, noting that if a grand jury separately gathered the documents handed over to civil examiners, there would be no need to suppress them.  In this appeal, neither party has focused on the documents produced by the defendants after firm indications of fraud emerged.  For the sake of clarity, we note explicitly that we reach

The tenor of the IRS's interviews does not in any way suggest that the suspects were either in custody or that their statements were compelled. The trial court's review of the record uncovered no indicia of coercion. "[The IRS agent] did not threaten, force, or trick the defendants." Indeed, the defendants declined to answer questions on numerous occasions, suggesting they felt free when they answered those questions that they did. At one point, Rutherford even laughed in explaining one of the deductions he was asked about. There is no evidence that the suspects relied on, or even knew of, the provisions of the manual in making the incriminating statements, which strongly suggests they were made voluntarily. Although defendants could argue the improper use of a civil examiner acted as a silent misrepresentation, lulling them into a false sense of security such that their statements were compelled, this argument is not persuasive for two reasons. First, the defendants bear the burden of proof here, and they do not claim, let alone put forward any evidence indicating, that the use of a civil examiner played a "crucial motivating factor" in their decision to answer questions in June 2004. Second, even if the defendants had believed there was only a civil investigation underway, the regulation does not stipulate that a civil investigation cannot later become a criminal investigation. As a result, the potential repercussions of making incriminating statements remained the same, and the defendants had no basis for concluding that a criminal investigation would not be undertaken in the future. Perhaps the defendants could argue they would have exercised greater caution if the agents questioning them had represented the investigation as criminal in nature, but notes of the conversations suggest the defendants were already guarded in their dealings with the IRS.

Our holding today is consistent with our caselaw prior to *McKee*. In *United States v. Nuth*, we stressed that evidence collected in the course of an improperly continued investigation will be suppressed only upon a "clear showing that the taxpayer was tricked or deceived." 605 F.2d 229, 234 (6th Cir. 1979); *see also United States v. Allen*, 522 F.2d 1229, 1233 (6th Cir. 1975) ("In the absence of a clear showing that the taxpayer has been tricked or deceived by the government agents into providing

the same result with respect to them as we do with respect to the defendant's statements.

incriminating information, the documents and statements obtained by the Internal Revenue agents are admissible."). In these decisions, this court has emphasized the effect of the government's action on the individual in determining whether suppression was constitutionally mandated, and observed that even certain affirmative misrepresentations will not give rise to a constitutional violation if the individual is not misled. *Nuth*, 605 F.2d at 234 (holding that the failure of an IRS agent to give certain warnings, as required by internal policy, did not require suppression, because the defendant was "an attorney who practiced to some extent and is an experienced businessman, and that as such he must have been aware of the 'potential criminal aspects' of an audit").

Nearly every other federal court to address this issue has held the IRS's violation of internal policy does not of its own force infringe upon a person's constitutional rights, thus requiring suppression of evidence.[3] In *United States v. Caceres*, the Supreme Court held that when the Constitution does not mandate a particular regulation, there is no need to exclude evidence improperly collected in violation of executive policy. 440 U.S. 741, 754-55 (1979) ("In view of our conclusion that none of respondent's constitutional rights has been violated here, . . . our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case."). Explaining this decision, the Court cited two reasons for its rule. First, there was a separation-of-powers issue. If the courts could simply exclude evidence whenever federal agents violated executive regulation, then it "would take away from the Executive Department the primary responsibility for fashioning the appropriate remedy for the violation of its regulations." *Id.* at 756. Second, and equally significant, the court noted, if the judiciary applied the exclusionary rule in an overinclusive manner, it would discourage agencies from adopting "protective regulations." *Ibid.* ("In the long

---

[3]In *McKee*, Judge Jones correctly observed that the First Circuit once suggested in dicta that the courts can enforce an overinclusive exclusionary rule when it comes to misconduct by the executive agencies. 192 F.3d at 541. The First Circuit said courts may exclude evidence collected in violation of agency rules that are designed to protect constitutional rights "even though these [agency] standards may go somewhat further than the Constitution requires." *United States v. Leahey*, 434 F.2d 7, 10 (1st Cir. 1970). Despite Judge Jones's comments to the contrary, this contention in *Leahey* is at odds with the Supreme Court's later decision in *United States v. Caceres*. *See* 440 U.S. at 751.

run, it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form.").

The United States Courts of Appeals have been equally reluctant to impose the exclusionary rule when the Constitution has not been violated by executive misconduct. In a case involving the same IRS provision, the Eighth Circuit held that failure to a refer a case to the Criminal Division must be accompanied by "clear and convincing evidence that the IRS affirmatively and intentionally misled the defendant" to violate the defendant's constitutional rights. *United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993). Likewise, the Seventh Circuit has held that "courts must remember that the 'firm indications of fraud' rule is but a tool for courts to utilize in determining whether the revenue agents made an *affirmative misrepresentations* to the a defendant or her representatives concerning the nature of their investigation." *United States v. Peters*, 153 F.3d 445, 453 (7th Cir. 1998) (emphasis in original); *see also Crystal v. United States*, 172 F.3d 1141, 1149 (9th Cir. 1999) (admitting evidence when the IRS agent's conduct "was totally innocent, albeit incorrect, and was in no sense a 'sneaky deliberate deception.'"). The Fifth Circuit has not addressed the specific provision of the IRS manual at issue in this case, but it has reached the same result in interpreting the effect of an agent's violation of another provision. *United States v. Tweel*, 550 F.2d 297, 299-300 (5th Cir. 1977) (suppressing evidence when the IRS conducted a criminal investigation through civil examiners *and* lied to the taxpayer's accountant about whether a "special agent" was involved, which would have indicated the inquiry was criminal).

If anything, these courts may have been too generous in defining the sort of conduct that rises to the level of a due process violation. Even when the police are conducting a custodial interrogation, the Supreme Court has held that mere deception will not violate a person's due process rights. *Moran*, 475 U.S. at 423. In the same vein, the Sixth Circuit has held: "Coercive police activity is a necessary predicate to a finding

that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 166 (1987).  This is a high standard to overcome, which is not itself satisfied by showing that a police officer lied.  When "promises of leniency, coupled with threats of immediate imprisonment, have a coercive effect on a suspect," due process rights are violated.  *Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991), *modified on other grounds*, 507 U.S. 680 (1993).  But the same conduct does not violate the Constitution when it does not have a "coercive effect."  *Ibid.*  In other words, even demonstrating that an affirmative misrepresentation was made in the course of taking a statement is insufficient to establish a violation of the Due Process Clause, requiring the suppression of evidence.  *See Moran*, 475 U.S. at 423 ("[E]ven deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident.").  The misrepresentation at issue must in fact overbear the will of the accused.  *See Johnson*, 351 F.3d at 261 ("Police promises of leniency and threats of prosecution can be objectively coercive.").

To affirm the district court's decision notwithstanding this record would be to embrace openly a double standard for the incriminating statements of white-collar criminals, making it much more likely their statements will be considered involuntary and thus excluded from criminal proceedings.  Such a rule would not only be hypocritical, it would be contrary to the Supreme Court's Fifth Amendment jurisprudence, which recognizes that statements made while under arrest, during a custodial interrogation with the prospect of imprisonment, are much more likely to involve coercion.  *See Miranda v. Arizona*, 384 U.S. 436, 468 (1966) ("[A *Miranda*] warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere.").  To increase the standard for voluntariness in a non-custodial context moves in the exact opposite direction of recent Supreme Court cases.

III

The Due Process Clause is not violated here where there was no deception or trickery and where defendants' statements were clearly voluntary. IRS agents did not engage in any affirmative misrepresentation, and to the extent that the very use of civil examiners silently misrepresented the nature of the government's investigation, the defendants have presented no evidence indicating that they relied upon the regulation so that their statements were not voluntary. In short, though government misconduct is regrettable, whether engaged in deliberately or, as here, merely negligently, the misconduct at issue in this case simply does not "shock[] the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). If a remedy does exist, it is not one this court may impose by application of the exclusionary rule. We therefore REVERSE the district court's pre-trial motion suppressing statements and documents and REMAND for further proceedings consistent with this opinion.

---

**CONCURRENCE**

---

COLE, Circuit Judge, concurring.  I join the majority's decision to reverse the district court's suppression of the defendants' post-June 17, 2004 statements, but I write separately to emphasize my belief that *United States v. Caceres* left the door open for courts to consider the IRS's violation of its internal policies as one aspect of the two-prong voluntariness analysis. *See* 440 U.S. 741, 754-55 (1979).  In short, though I agree that the IRS's failure to comply with its internal policy does not amount to a *per se* violation of a defendant's constitutional rights, a court is entitled to consider (and, in fact, *should* consider) such non-compliance in analyzing whether the IRS made affirmative misrepresentations to a taxpayer about the nature of its investigation.  Thus, I conclude that the IRS's failure to refer a case is a crucial consideration in evaluating whether the IRS made affirmative misrepresentations to a defendant about the nature of its investigation.

As the Seventh Circuit has accurately noted:

> On the one side, courts face the Scylla of judicial micro-management of the inner functionings of an administrative agency, a peril recognized by many of the courts that have addressed this issue.  Yet, on the other side, courts face the Charybdis of judicial abdication of their Article III duty to protect the constitutional rights of criminal defendants. . . . [T]his latter peril will be realized if the courts are forced to rely solely on the after-the-fact assessments of revenue agents who may have an incentive to use the discretionary nature of the 'firm indications' rule to shield their actions from judicial scrutiny. . . . In navigating the narrow course necessitated by these two perils, courts must remember that the 'firm indications of fraud' rule is but a tool for courts to utilize in determining whether the revenue agents made an *affirmative misrepresentation* to a defendant or her representatives concerning the nature of their investigation.

*United States v. Peters*, 153 F.3d 445, 453 (7th Cir. 1998).  Further, there is certainly risk that the public's trust in the IRS will be undermined should the IRS's "internal

operating procedures afford anything less than faithful adherence to constitutional guarantees." *See United States v. McKee*, 192 F.3d 535, 544 (6th Cir. 1999).

Therefore, although the IRS's failure to timely refer its investigation of defendants to its criminal unit amounts to mere negligence in *this* case, I can certainly foresee a situation in which the IRS intentionally pursues a criminal investigation under the auspices of a civil investigation. *See United States v. Tweel*, 550 F.2d 289, 299 (5th Cir. 1977) (suppressing evidence where IRS agent falsely stated that the audit was routine though he knew that a special investigator was involved); *United States v. Kontny*, 238 F.3d 815, 819 (7th Cir. 2001) (an affirmative misrepresentation could occur where an agent "pretend[s] to be a U.S. Attorney and assure[s defendants] that they would not be prosecuted if they cooperated with him. . . ."). Moreover, although I agree with the majority that the issuance of a summons on its own will not make a defendant's statements in response to thereto involuntary (Maj. Op. 8), a scenario of intentional government misrepresentation becomes even more probable given that the IRS is statutorily entitled to issue a civil summons to a taxpayer for a purely criminal investigation. *See*, *e.g.*, *Scotty's Contracting & Stone, Inc. v. United States*, 326 F.3d 785, 788 (6th Cir. 2003) (the IRS's authority to issue a summons for the purpose of investigating any offense relating to the tax code, be it civil or criminal, is extinguished *only* when the investigation is referred to the Department of Justice) (citing 26 U.S.C. § 7602 (IRS civil summons power)).

In conclusion, given the substantial likelihood that the IRS may intentionally blend its civil and criminal arms in conducting an investigation, we must strongly encourage the agency to observe and protect the public's constitutional rights when exercising its power. Allowing courts to consider the impact of the IRS's violations of internal policies on a defendant's constitutional rights helps to achieve this goal.